# CHARLESTON.

Joseph H. McDermott *et al.* v. Fairmont Gas & Light Co. *et als.*

Submitted April 26, 1921.   Decided May 17, 1921.

1. Brokers—*Broker Held Entitled to Commission on Full Purchase Price, Though Purchaser Fails to Pay Deferred Payments.*

   Under a contract between the owner of property and a broker by which the broker is to receive 4% of a stipulated sale price for the property if he finds and produces a purchaser ready, able and willing to pay that price in cash; and such purchaser is found and produced by the broker and a sale is made through further negotiations between the owner and such purchaser for part cash and deferred payments, without the knowledge or concurrence of the broker, the broker is entitled to his commission on the full purchase price, although the purchaser afterwards fails to pay the deferred payments, and the property is returned to the owner for such failure, under a clause in the sale agreement.   (p. 699).

2. Corporations—*Acceptance by Corporation of Benefits of Unauthorized Contract by President a Ratification.*

   Where the president of a private corporation, without authority from the corporation, makes a contract for the sale of corporate property, and the corporation afterwards accepts and retains the benefits of the contract, it thereby ratifies the contract and will be bound to perform its obligations thereunder.   (p. 699).

3. Principal and Agent—*When Agent May Act for Two Principals Stated.*

   An agent may act for two principals in the same transaction

where his duties do not require him to do incompatible acts; or if the employment does not imply trust and confidence, as where he is a mere middle-man who brings them together and then leaves them to bargain for themselves. In such cases he violates no duty in undertaking to perform such service for both, and may properly receive compensation from both. (p. 706).

4. CORPORATIONS—*Acts of Corporations Held a Ratification of Unauthorized Sale of its Property.*

Where an unauthorized contract is made by a president of a private corporation with a broker for the production of a purchaser of the property of the corporation, for an agreed commission on the agreed sale price, and as a result thereof a sale is made to such purchaser so produced, and the benefits thereof accepted by the corporation; and after such sale a part of the commissions of the broker is paid by the treasurer of the corporation by direction of members of the executive committee of the directors, the contract is thereby ratified, and the corporation will be bound to perform its obligations thereunder. (p. 707).

(POFFENBARGER, JUDGE, absent).

Appeal from Circuit Court, Marion County.

Action by Joseph H. McDermott and others against Fairmont Gas & Light Company and others. From judgment for alleged insufficient amount, plaintiffs appeal.

*Reversed and remanded.*

*Cox & Baker, David C. Reay* and *Chas. A. Goodwin,* for appellants.

*Charles Powell, Osman E. Swartz,* and *Tusca Morris,* for appellees.

LIVELY, JUDGE:

Plaintiff instituted suit against Fairmont Gas and Light Co. and its stockholders to recover the sum of $40,000.00 claimed by him as commissions on the sale of the company's property and assets to Russell Palmer at the price of one million dollars, brought about through his efforts and under a verbal contract made by plaintiff with S. L. Watson, president of the company, and recovered a decretal judgment for the sum of $7,275.00, from which he prosecutes this appeal.

The bill alleges, substantially, that McDermott made a verbal agreement with S. L. Watson, president of the defendant company and claiming to represent its stockholders, at Fairmont, W. Va. in August, 1912, by which it was agreed that if plaintiff would present a purchaser of all the assets and properties of the company who would pay therefor the sum of $1,000,000.00, and purchase, then plaintiff would be paid a commission of 4% or $40,000.00; that in pursuance of the agreement, (having associated with himself one A. F. Gressler, in his efforts to procure a purchaser, and who, after this suit was begun, transferred all his claims to plaintiff) he did procure and produce and introduce Russell Palmer of Mobile, Ala., who, after considerable negotiations, purchased the property by written agreement for the sum of $1,000,-000.00 on Nov. 22, 1912, from certain of the stockholders then holding more than 80% of the capital stock of the company; and that afterwards on Dec. 20, 1912, the stockholders approved and ratified said sale and agreement, and directed and caused to be executed a deed therefor to a corporation, Fairmont Gas Company, formed by the purchaser, who made a down payment of $125,000.00, and on or about the 1st of February, 1913, a further payment of $125,000.00. The bill charges that the stockholders had full knowledge of the services rendered by plaintiff when they ratified and confirmed the sale to Palmer, and afterwards on February 21, 1913, the defendant company paid to plaintiff $5,000.00 as part of the commissions due him; that afterwards the defendant company distributed the moneys received by it from Palmer among its stockholders, and then surrendered its charter and went out of corporate existence without paying or making provision for the payment of plaintiff's debt amounting to $35,000.00. The bill prays for a discovery, and for recovery of the said sum and for general relief.

The bill was filed at April rules, 1915, and in June, 1916, the defendant company, S. L. Watson as president and in his own right, Fairmont Gas Company, a corporation, and Frank B. Pryor as secretary of the last named corporation, and in his own right, filed their joint and several answers, giving the names of stockholders and the number of shares of stock

held by them at the time of the dissolution of the defendant company and distribution of moneys received from the sale, and detailing the transactions with McDermott leading up to the time of the agreement for payment of commissions. They deny that S. L. Watson claimed to represent the company in that agreement with McDermott or that he represented any of the stockholders on that occasion; on that subject they say that Watson ''simply stated to the said McDermott that if a purchaser was produced who desired to purchase the entire property at a price of One Million Dollars to be paid in cash, he, the said Watson, believed and felt that himself and other stockholders associated with him holding together from seventy five to eighty per cent of the capital stock of said Company would feel disposed and willing to sell the property of said Company, if the stockholders of the Company should so decide, at the said price of One Million Dollars, to be paid in cash; but the said Watson never at any time claimed to said McDermott, or otherwise, to have the right and power to sell and negotiate for the sale of said property; and on the question of commissions on any such sale, the said Watson, in any conversation which he had with the said McDermott, simply stated that should a purchaser be presented who should purchase said property at the sum of One Million Dollars, to be paid in cash, and who was willing, able and anxious to purchase the same, and the sale and purchase thereof at said price should be negotiated, consummated and completed, and the said purchase price so paid, he and those associated with him holding together from Seventy-five to Eighty per cent of the capital stock of said Company might feel disposed to pay a commission on the said purchase price if the stockholders of said Company should so decide; but the said Watson never at any time, to the said McDermott or otherwise, claimed to have the right to negotiate and contract for the services of the said McDermott and for the payment of commissions or compensation to him therefor, on behalf of the said Company or its stockholders.''   The answer then details in full the proceedings subsequent to the agreement for commissions with Watson, the meeting with Palmer at Atlantic City, the sale of the property to him for

$1,000,000.00, if upon examination by Palmer's engineers and auditors the property was as represented; the examination and reports made by them; the conclusion of Palmer to buy at the stipulated price; further negotiations culminating in the sale to him for that price but not for cash, but upon payment of $125,000.00 cash and the remainder at intervals; the formation by Palmer of a West Virginia company under the corporate name of Fairmont Gas Company, with authorized capital stock of three million dollars, to which the property was deeded, and the entire stock of which. except five shares, was issued to Palmer and, with the deed. held in escrow awaiting the liquidation of the deferred payments of purchase money; the failure of Palmer to pay the deferred payment of $250,000.00; the taking of the property by the defendants under the forfeiture clause of the agreement, together with the $250,000.00 paid by Palmer; the taking over of the stock and absolute control of the new corporation formed by Palmer, the Fairmont Gas Co., by defendants; the sale of the entire property and the said stock in the new corporation to J. H. Wheelright by the defendants on January 22, 1914 for $750,000.00. The answer further details the efforts of McDermott to· obtain payment of his commissions, and an explanation of the payment to McDermott of $5,000.00 on February 21, 1913 as a part of his commissions, in which it is stated that the same was paid out of a fund in bank to the credit of S. L. Watson, trustee, by check of Walton Miller, the treasurer of defendant company, while Watson was in the South, and which payment he, Watson, disapproved on his return. The answer further details the dissolution of the defendant company, the distribution of the assets to the stockholders, consisting of $750,000.00 derived from Wheelright and the $250,000.00 derived from Palmer. The answer denies any obligation to the plaintiff on his claim for commission, denies that Watson acted for the defendant company or any of the stockholders in his negotiations with McDermott, denies that any of the stockholders. except possibly a few, knew of such negotiations, denies ratification thereof by any act of the stockholders or directors, and explains the payment of $5,000.00 to plaintiff on his com-

mission as unauthorized.  Answers were filed by other defendants, which contain practically the same averments and denials.

The pleadings and evidence develop the salient facts that Watson, as president of the defendant company and representing business associates owning 75 or 80 percent of the stock, whom he thought would ''join or act with him'', made an agreement with plaintiff for the production of a purchaser for the corporate property at a price of one million dollars, and if as a result thereof a sale was made, then plaintiff should have a commission thereon fixed at 4%.  The main controversy exists over the nature and character of this agreement, made in the office of Watson at Fairmont in July, 1912.  As a result of this agreement Palmer purchased the property of the defendant, for the price stipulated, from Watson and certain of his associates owning in excess of 80% of the entire stock, afterwards confirmed by legal corporate action, and paid $250,000.00, but failed to pay the remainder of the purchase money, and after failure the property was on December 3, 1913 taken back by the corporation, and the money so paid by Palmer was retained by the stockholders without protest from Palmer; and McDermott was paid $5,000.00 on his claim for commission.

Defendants' main defenses may be summed up as follows:

1.  Want of inherent power in Watson as president to employ or contract with plaintiff concerning a sale of its corporate property; or want of power express or implied in its president to act in its behalf in that regard.

2.  Plaintiff did not produce a purchaser who could and did pay one million dollars in cash, thereby failing to perform his contract.

3.  The stockholders, except a few, had no knowledge of plaintiff's contract or claim, and made no ratification.  No corporate action thereon appears in the records of defendant company.

4.  Even if the contract for commissions was binding on the corporation, the fact that plaintiff also participated in compensation paid by Palmer to Gessler would avoid the same because of dual agency.

5. Defendants are not estopped to deny liability for Watson's acts, or liability to plaintiff, because after suit they did not formally repudiate Watson's unauthorized act, and restore the benefits received thereby.

It is insisted on behalf of the plaintiff that the defendant company and its stockholders held out Watson to those dealing with him as having authority to dispose of the corporate assets, and he, having acted, and his acts having been confirmed, they are estopped from denying his power and authority to bind the corporation; that defendants made the sale to Palmer and thus took the benefit of plaintiff's services in making the sale possible, and retained the benefits after full notice of plaintiff's services, and are hence estopped from denying the ultra vires act of their president in employing plaintiff to interest a purchaser in the property and effect a sale; that the institution of the suit in April, 1915, and service of process was conclusive notice of plaintiff's contract for commissions, and having since that time continued to retain the benefits, defendants cannot now interpose want of knowledge; that division between plaintiff and Gressler of commissions on the sale received from the purchaser, Palmer, cannot bar plaintiff from the benefit of his contract with Watson; that because Palmer purchased on part cash and deferred payments and failed to pay the delayed payments, did not defeat plaintiff's contract for commissions; and that plaintiff having been the efficient cause of the sale, he is entitled to compensation on a quantum meruit, even if there had been no express contract.

The lower court came to the conclusion that McDermott and Watson agreed at the Fairmont conference when Phillips was present that the purchase price should be one million dollars cash, and that if McDermott did produce such a purchaser, who, in the judgment of the corporation's officials and especially Watson, was considered as able and willing to pay that price in cash, then McDermott should, upon such sale, receive a commission of 4%. The court further concluded that whatever contract was made by Watson with McDermott was made without previous authority from the stockholders or the corporation, that the president had no such inherent pow-

er, and that no mention was made of any such contract with McDermott on the records of the corporation at any of its meetings, but that whatever action Watson took or whatever contract he made would be binding only upon the corporation and its stockholders to the extent that it inured to their benefit; and that the only material benefit the corporation and its stockholders derived from the agency or efforts of McDermott was the sum of $250,000.00 paid by Palmer and distributed to the stockholders, and therefore they would be responsible to McDermott to the extent of 4% of this amount, or the sum of $10,000.00, and so decreed, giving the corporation credit for the $5,000.00 paid in 1913, and awarding interest on the remaining $5,000.00, making the sum decreed to be $7,275.00.

It will be instantly perceived that the lower court has necessarily changed the terms of the contract as ascertained by it from the evidence, and has made the plaintiff's compensation depend upon whatever amount in cash was paid by the purchaser. If the down payment had been $1,000.00 and nothing further paid the compensation of McDermott would have been $40.00, irrespective of the services performed by him. His pay would depend upon the kind and terms of whatever contract the corporation might make with the purchaser, and the ultimate result thereof. Under that rule or holding if the officers of a corporation should make a sale to the purchaser produced, resulting in greater loss than gain to the stockholders, the broker or agent would be entitled to no compensation. It would make the broker's commission dependent upon the beneficial outcome of the venture. For instance, if the money paid by the purchaser was $50,000.00 and the damage to the property under his management should be an equal or greater amount before it could be recovered by the seller, on what sum would commissions be computed if material benefits received are fixed as the basis of and governing the commission to be paid? The logical result of such a construction would be to allow the seller to repudiate commissions if no material benefit was derived from the sale into which he entered. It would be a dangerous rule to establish. If an unauthorized contract be made by an officer of a cor-

poration, afterwards confirmed and approved by the acceptance of benefits arising therefrom by the corporation, it will not be permitted to annul, vary or emasculate the contract by a change of its terms, based upon the amount of benefits received. If it accepts benefits, it must accept the terms of the contract. If the contract in terms, or reasonably interpreted, makes the commission dependent on the beneficial result of the sale to the vendor, and based on the benefits measured in terms of money, then such a holding would be clearly proper; it would be simply carrying out the contract, and making effective the intention of the parties. Was there such an agreement between Watson and McDermott? We cannot so interpret it. Watson insists that McDermott was to produce a purchaser who would buy at a million dollars and pay in cash, and that because Palmer did not pay the total purchase price in cash, then McDermott was not entitled to any commissions. He does not even intimate, nor does counsel contend, that the commissions should be 4% on any sum less than the full sale price. The defense is that McDermott is entitled to no commissions because he did not find and introduce the kind of purchaser stipulated in the contract. On the other hand, McDermott insists that he was to find a purchaser, then having one in mind, who would pay the price of one million dollars, and that the terms of the sale were to be negotiated between the purchaser and Watson. He says that Watson told him to bring on his purchaser, who would pay one million dollars, "that is our price on this piece of property, we will sell it to him. We will make our own trade." McDermott stated that all he was to do was interest and find the purchaser, and to have nothing to do with the terms of the trade, and was not present when the trade was made, and knew nothing about the terms agreed upon until after the sale was completed, and had nothing whatever to do with the subsequent modifications. He claimed that he was told by Watson, after Palmer had made the first payment, that his commissions would be taken care of "as soon as we get around to it"; but after the property had been taken back from Palmer and sold to Wheelright, Watson then said that they didn't think they owed him the

$40,000, because Palmer had not completed paying for the property, but that they would pay something for his services. It is to be noted that the $5,000.00, which was paid to McDermott on his commission, was paid on February 21, 1913, and that the property was not taken back from Palmer until December 3, 1913.

John F. Phillips, who was a director and a member of the executive committee of the defendant company, was present when the commission contract was made, and his understanding of the agreement was that if McDermott furnished a purchaser who would take the property at one million dollars, that a commission of 4% on that amount would be paid him, and that he was left under the impression ''that if the party would make a substantial payment, everything would be right.''   The testimony of Phillips, although one of the defendants and closely connected with the management of the defendant company, and possibly testifying against his own interests, strongly corroborates that of McDermott on this very important part of the controversy.   Mr. Phillips also testified that in contracting with McDermott for the commission of 4% on the sale Mr. Watson was acting as agent of the corporation, but when pressed to state how he knew he was acting as such and by what authority, he qualified his statement by saying.   ''He (Watson) was president, member of the board of directors, member of the executive committee and chairman, and his word was final at all times'', but that he, the witness, had never heard of any authority given Watson by the directors or executive committee to employ McDermott to find a purchaser for the property.   This witness also stated that the executive committee knew of the existence of the McDermott contract with Watson for a commission, before the sale agreement with Palmer was made on November 22, 1912.

So the controversy over the contract is whether McDermott is entitled to any commission whatever; and from the divergent statements of the makers of the contract we fail to find any basis for limiting the commission to any sum less than 4% on the purchase price, or on any sum to be ascertained or measured by the benefits derived by the corporation or its

stockholders if a sale should be made resulting therefrom. McDermott is entitled to full commissions, or to none.

The attitude of defendants is well stated by its counsel as follows: "We insist that no other finding was possible than that the sale was to be for one million dollars to be paid in cash, and it was on this character of sale that the commission depends, and on no other"; and, "If he (Palmer) had had the money and paid, Watson would have been obliged to pay the $40,000.00 to McDermott. Not having the money and not paying, McDermott was entitled to nothing, for he had accomplished naught." What principle of law governs if we view the contract as claimed by the defendant? McDermott produced a purchaser who met Watson and some of his associates in Atlantic City and who then agreed to purchase the property for one million dollars cash if upon investigation and report the property was what it was represented to be. Upon investigation he became satisfied with the property, but advised that he had been disappointed in procuring the purchase money, and asked for terms, which were granted him by the defendant company's officers, culminating, after subsequent modifications, in the purchase, sale and delivery of the property, by which $250,000.00 was actually paid to defendant company, but default was made in the remainder of the purchase price, whereupon the company took back the property, and kept the $250,000.00 paid to it. A short time after taking back its property it sold the same to one of its stockholders, Wheelright, for $750,000.00. These changes from and modifications of the cash price originally agreed upon with Palmer were without the knowledge or consent of McDermott, so far as the record discloses. He was to have nothing to do with making the deal. That was to be done by the defendants with the purchaser. There was to be no middleman. Watson told McDermott to bring on his man, he wanted to look him over, and he would make his own deal with him. Can it be said that McDermott had accomplished naught? Is it not conclusive that by reason of his contract and his efforts he has brought to the pockets of the defendants $250,000.00, which they yet retain? He was the efficient procuring cause. But defendants assert that the purchaser was

to pay the full purchase price in cash, before McDermott would be entitled to his commission. If a vendor would be permitted to defeat the commissions of a broker by changing the terms of purchase with the purchaser, found and produced by the broker, it would open the door of fraud and collusion between the seller and buyer, and practically defeat recovery of a broker's commission. It was in the power of defendants to require full cash price from Palmer or refuse to sell. If they had refused to sell unless for cash, then McDermott would have no claim, presuming that his contract required a cash purchaser; but having waived that right, and having made the sale for other than cash, they cannot defeat his commission. Nor can they, by so doing, vary his contract without his consent, and limit his commission to the cash actually paid, be it great or small. 4 R. C. L. sec. 59. "If a broker has brought the parties together and as a result they conclude a contract, he is not deprived of his right to a commission by the fact that the contract so concluded differs in terms from the one which he was authorized to negotiate." 19 Cyc 249; *O'Toole* v. *Tucker,* 40 N. Y. Supp. 695; *Keys* v. *Johnson,* 68 Pa. St. 42; *Woods* v. *Stephens,* 46 Mo. 555; *Ice* v. *Maxwell,* 61 W. Va. 9; *Reynolds* v. *Tompkins,* 23 W. Va. 235. Under the contract as claimed by Watson and the defendants, they could not, by varying the terms of the sale to Palmer from cash to part cash and part delayed payments, defeat plaintiff's right to compensation. On the other hand, if the terms of the contract were as claimed by McDermott and Phillips, that is, that McDermott was to procure and present a purchaser who would purchase for the price of one million dollars, the terms to be negotiated between Watson and his associates and the purchaser, then McDermott is entitled to his commission, notwithstanding the failure of the purchaser to pay the balance of purchase money, or to comply with some of the terms of his purchase. *Linton* v. *Johnson,* 81 W. Va. 569; *Hugill* v. *Weakly,* 64 W. Va. 210.

Watson had no inherent power as president of the corporation to make the contract with McDermott. Ordinarily a president of a corporation can make no binding contract

looking to a sale of the corporate assets without first obtaining authority. It is claimed by counsel for plaintiff that the corporation and its stockholders held Watson out to the public as having authority to make such contracts as he might wish, and by reason of this his contract was binding on the corporation and it and its stockholders are estopped from denying his authority independent of subsequent ratification. There is considerable evidence to sustain this contention. Watson and his friends and associates owned or controlled about 75% of the stock, and whatever he did appears to have been sanctioned and approved by them. His word governed. He was president, director, member of the executive committee and chairman thereof, and no important step in corporate affairs or management was taken without consultation with and approval by him. He appears to possess consummate executive ability, and was the central and commanding figure in the corporation. But it is not necessary to pass upon this contention of the plaintiff. It is quite evident, and is not disputed, that the property was sold to Palmer by reason of the contract with McDermott and that the corporation and its stockholders realized $250,000.00 thereby, which they have distributed among themselves. They cannot, after taking the benefit of his services in their behalf, deny him compensation for his services. The principle of law applicable is stated by Judge Ritz in *Chafin* v. *Main Island Creek Coal Co.,* 85 W. Va. 459, as follows: "Where a private corporation accepts the benefit of a contract made on its behalf by an unauthorized agent, it thereby ratifies the contract in its entirety and will be bound to perform the obligations provided by the contract to be performed on its part." Authorities sustaining this proposition are collated in that case, and it would serve no useful purpose to make additional citations or comment thereon. Some of the witnesses testified that McDermott's services were worth on quantum meruit more than the 4% contracted for.

It is insisted that Palmer was not able to pay the purchase price and did not pay, and therefore McDermott is entitled to no compensation under his contract to produce a purchaser who could and would pay one million dollars cash. In ad-

dition to what we have said concerning the voluntary change
in the terms of a sale by the vendor, without the consent of
the agent or broker, it may be observed that there is no direct
evidence to show that Palmer was not financially responsible
to pay at the time of the purchase or at the time of the taking
back of the property, under the forfeiture clause of the sale
agreement, by the corporation.   The record is replete with
failures of Palmer to make his payments when due, and that
he had difficulty in raising the $250,000.00 which he did pay.
No effort appears to have been made to ascertain if the obliga-
tion of his purchase could have been successfully asserted;
no judgment obtained.   The corporation elected to take back
its property and keep the money already paid.   However, we
think his failure to pay has little bearing on the right of Mc-
Dermott to receive compensation for his services.   *Linton* v.
*Johnson, supra;* 19 Cyc 271.

There is evidence to show that the officers of the corpora-
tion, and especially the executive committee of the board of
directors knew that the purchaser, Palmer, was procured by
McDermott and that McDermott was to receive a commission
therefor, prior to the agreement of November 22, 1912,
although the records of the corporation do not disclose that it
was discussed at any of the official meetings.   Phillips tes-
tified that the executive committee knew of it before that time,
and Walton Miller, the treasurer of the company, and M. L.
Hutchinson, the vice-president, state that they had knowledge
of McDermott's contract; and it would be most natural that
the close business associates and friends of the president
whom he said would "go along with him" and who owned
75% or 80% of the stock, would be advised of the full details
at least informally.   Those who signed the agreement to sell,
and which agreement was unanimously ratified at the stock-
holders' meeting, do not appear as witnesses to negative such
information.   Strongly indicative of this knowledge is the
payment of $5,000.00 to McDermott on his commission on
February 21, 1913, out of the money paid by the purchaser
and then in bank to the credit of Watson, trustee, by Walton
Miller, the treasurer of the corporation, after consulting with
and receiving concurrence of members of the directorate.

Would they pay out this sum without knowledge? Shrewd, successful business men, responsible to their stockholders, do not usually pay out such sums blindly. Watson disapproved of the payment, after returning from the South, but there was no demand made on McDermott for return of the money as an erroneous or unauthorized payment, neither was any action taken to recover it from him. This payment not only indicates knowledge of the contract and confirmation of it, but recognized that there was merit in the claim. McDermott never claimed less than his full commission agreed upon, and was in Fairmont insisting upon its payment when the check was drawn in his favor for the $5,000.00. The law imputes to a person knowledge of facts of which the exercise of common prudence and ordinary diligence must have apprized him. *Cain* v. *Cox*, 23 W. Va. 594. Knowledge of the acts of an agent and confirmation or acquiescence therein may be deduced from circumstances and facts of the case. *Curry* v. *Hale*, 15 W. Va. 867.

There was an agreement between McDermott and Gressler that the former should participate with the latter in whatever compensation the latter should receive from Palmer, the purchaser, and this fact is interposed by the defense to defeat McDermott's compensation on the theory of dual agency, or that he was representing principals whose interests were opposed. McDermott had no discretion in making the contract between the vendor and vendee. He did not participate therein and was not present. All he contracted to do was to find and introduce the purchaser who would take the property at a stipulated price. He was what is termed a middle-man. In such cases the doctrine of conflicting dual agency and bad faith does not apply. "A middle-man who acts as a broker in bringing together buyer and seller, and who does not act as either in making the contract of purchase, is entitled to compensation from both, on an agreement with each." *Runyon* v. *Morrison*, 71 W. Va. 254, and authorities there cited. *Peters* v. *Riley*, 73 W. Va. 785. Where an agent is representing two or more principals of divergent and opposing interests, and from the nature of his employment they are entitled to his judgment, discretion or per-

sonal influence, he will not be permitted to act unless with their full knowledge and consent; but where neither principal relies upon the judgment or discretion of the agent in some transaction he violates no duty in undertaking to perform the service for both, and therefore may properly have compensation from both. *Montross* v. *Eddy,* 94 Mich. 100; *Knouss* v. *Gottfried Brewing Co.,* 142 N. Y. 70; *Green* v. *Robertson,* 64 Cal. 276.

Defendants further say that plaintiff is not entitled to the benefit of his commission contract because there never was a purchase of the assets of the corporation by Palmer. They construe the agreement by which he took over the property as an option contract, and hence plaintiff did not find or produce a purchaser as his contract required. An inspection of the agreement of November 22, 1912, afterwards approved and confirmed by the stockholders, impels the conclusion that there was a full and complete sale of the property of the corporation to Palmer. In carrying out that agreement the stockholders, after reciting the terms thereof, resolved, "That this company do grant, convey, assign, transfer and set over unto said Fairmont Gas Company for said Russell Palmer the said property rights, privileges and franchises, at the price and upon the terms and conditions in said agreement set out"; and directed its proper officers to make, execute and deliver proper deeds. All parties considered a sale had been made, and the purchaser took charge of the property, deeds were made and placed in escrow, money to the amount of a quarter of a million dollars was paid over in pursuance of the purchase. The transaction had few ear marks of an option. An option generally is a contract by which the owner of property agrees with another that he shall have the right to purchase the same at a fixed price within a specified time. It is a contract to sell if the other party shall elect to purchase within the time given. "An option contract to purchase is but a continuing offer to sell, and conveys no interest in the property". *Caldwell* v. *Frazier,* 68 Pac. Rep. 1076. It is a privilege to purchase, and is unlike a contract of sale which gives mutuality of remedy to both parties,

88 W. Va.

which either can enforce by specific performance. See *Jones* v. *Elkins,* 63 W. Va. 158.

The decree of the circuit court of Marion County, entered on July 20, 1920, is reversed in so far as it adjudges the Fairmont Gas and Light Company to be indebted to the plaintiff in the sum of $7.275.00; and proceeding to render such decree as should have been entered by said court, it is adjudged, ordered and decreed that the plaintiff, Joseph H. McDermott, do recover of and from the Fairmont Gas & Light Co. the sum of $35,000, with interest thereon from December 21, 1912, being the remainder of the commission or compensation due to said McDermott in his own right and as assignee of his co-plaintiff, Gressler, at the rate of 4% on $1,000,000.00, less the sum of $5,000.00, heretofore paid to said McDermott by said company, and that the stockholders of said company, to whom distribution was made of the assets of said company, are and each of them is liable to account for and pay over to said McDermott such prorative part of the amounts received from said assets of said company as shall be necessary to pay off and satisfy said sum of $35,000.00, and interest found to be due and owing to said McDermott. And this cause is remanded to the circuit court of Marion County to ascertain and fix the amount to be paid by each stockholder as herein ordered, and for such other proceedings as may be necessary to effect the relief herein awarded.

*Reversed and remanded.*