# CHARLESTON.

W. E. AVERILL v. HART & O'FARRELL, *Partners, Etc.*

(No. 5542)

Submitted March 23, 1926. Decided April 20, 1926.

1. APPEAL AND ERROR—*Although Admitting Confidential Communication By Defendant to Attorney That Plaintiff Was Entitled to Commissions as Broker May Have Been Error, Where Evidence So Preponderated In Favor of Plaintiff That Such Improper Evidence Would Not Have Changed Verdict, Such Verdict Will Not Be Disturbed.*

Though it may be error to admit a confidential communication of defendant to his attorney to the effect that plaintiff was entitled to commissions in a suit by the latter against the former to recover commissions, and then later to strike out that evidence and instruct the jury to disregard it (the damaging evidence having gone to the jury over objection), yet, where, as in this case, the evidence so preponderates in favor of plaintiff that the appellate court cannot clearly see that such improper evidence would have changed the verdict, the same will not be disturbed. (p. 420.)

(Appeal and Error, 4 C. J. §§ 2949, 2973).

2. EVIDENCE—*Although Testimony Tending to Show Unaccepted Offer of Compromise is Incompetent, Where Such State-*

*ments Were Made Without Attempt to Make Compromise,*
*They Are Admissible as Declarations Against Interest.*

While testimony offered to show an unaccepted offer of
compromise is incompetent and inadmissible, where it ap-
pears that such statements were made without any attempt
to effect any compromise between the parties, such testi-
mony is admissible under the well-established rule that the
declaration of parties to the record against interest may be
shown in evidence.   (p. 420.)

(Evidence, 22 C. J. §§ 347, 400.)

3.   BROKERS—*In Determining Whether Broker Has Earned Com-*
     *mission for Procuring Purchaser, it is Enough That Ef-*
     *forts of Broker Were Procuring Cause of Purchase, and*
     *They Need Not Necessarily be Sole Cause.*

In determining whether a broker has earned a commission
for procuring a purchaser, it is enough that the efforts of the
broker are the procuring cause of the purchase, but it need
not be the sole cause.   (p. 423.)

(Brokers, 9 C. J. §§ 95, 96.)

4.   SAME—*If Broker Sets In Motion Machinery by Which Sale*
     *is Made, Which Without Break In Its Continuity, Was Pro-*
     *curing Cause of Sale, He is Entitled to Commission, Al-*
     *though He Does Not Conduct All Negotiations; Ordinarily,*
     *Whether Broker Has Set In Motion Machinery by Which*
     *Sale is Made so As to Entitle Him to Commission is Ques-*
     *tion of Fact for Jury.*

The broker is entitled to his commission, although he may
not have conducted all of the negotiations leading to the sale,
it being sufficient if he set in motion the machinery by which
the work was done, which without break in its continuity
was the procuring cause of the sale.   Whether or not this
was the case, ordinarily, is a question of fact for the jury.
(p. 424.)

(Brokers, 9 C. J. §§ 97, 129.)

5.   SAME—*Expression "Procuring Cause," Used in  'escribing*
     *Agent's Activity, Refers to Cause Originatin{ Seri ?s of*
     *Events, Which, Without Break in Continuity, Result in*
     *Accomplishment of Object of Employing Agent, Which is*
     *Procurement of Purchaser Ready, Willing, and Able to*
     *Buy Property on Principal's Terms.*

The expression "procuring cause," as used in the books,
refers to the cause originating a series of events, which,
without break in their continuity, result in the accomplish-
ment of the prime object of the employment of the agent,

which, as stated, is the procurement of a purchaser ready, willing and able to buy the real estate on the principal's terms.  (p. 423.)

(Brokers, 9 C. J. § 96.)

6. SAME—*That Owner Voluntarily Consummates Sale and Conveys Real Estate is Conclusive Evidence That Purchaser Was Willing and Ready to Buy at Satisfactory Price.*

When the owner voluntarily consummates the sale and conveys the real estate, this is conclusive evidence that the price was satisfactory, and that the purchaser was willing and ready to buy.  (p. 423.)

(Brokers, 9 C. J. § 87.)

7. SAME—TRIAL—*"Procuring Cause" of Sale and "Proximate Cause" Are Substantially, if Not Quite, Same in Meaning; Even if There is Difference in Meaning Between "Procuring Cause" and "Proximate Cause," Omission of Latter Term in Court's Charge to Jury Would Not be Error, in View of Fact That Another Instruction Sufficiently Stated Issue (Code, c. 131, § 22).*

"Procuring Cause" and "approximate cause" are substantially, if not quite, the same in meaning.  But, admitting a shade of difference, it would be too much of a refinement to hold that the omission of the latter term in the court's charge to the jury would be error.  (p. 423.)

(Procuring Cause, 32 Cyc. p. 574; Trial, 38 Cyc. p. 1785; Proximate Cause, 32 Cyc. p. 745.)

(NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Greenbrier County.

Assumpsit by W. E. Averill against Hart & O'Farrell, partners, to recover commissions.  Judgment for the plaintiff, and defendants bring error.

*Affirmed.*

*M. L. Jarrett* and *Dice & Easley,* for plaintiffs in error.
*Miller & Garnett,* and *Price & McWhorter,* for defendant in error.

WOODS, JUDGE:

This is an action in assumpsit to recover commissions for making sale of a certain boundary of timber, containing 2,000 to 3,400 acres, located in Greenbrier county.  On the 24th day

of August, 1924, the defendants entered into an agreement in writing with the plaintiff, by the terms of which the plaintiff was employed to make sale of said timber owned by them, in which it was agreed that the plaintiff should have for his services in connection with such sale, the sum of 10% of the selling price; and further, it was agreed that pending negotiations with any prospective purchaser solicited or brought on the ground by the plaintiff, the defendants should make sale of the said timber direct, the plaintiff should be entitled to the same compensation as if the sale had been conducted solely by him.

The plaintiff, a citizen of Corry, Pennsylvania, was engaged in some timber operations in Greenbrier County, West Virginia, close to the timber in question, and the home of the defendant Hart.. Earlier in the same year the plaintiff had an oral agreement with the defendants for the sale of the same timber on a commission, and to this end he had not only communicated with many of his acquaintances in Pennsylvania, but had made frequent trips to that state, on the quest of prospective purchasers, with the result that W. B. Shaffer and Earl R. Brown, of Corry, and F. P. Obert, of Pittsfield, all of Pennsylvania, came to White Sulphur Springs to examine the property. It was at this time that the plaintiff requested and obtained the execution of the written contract hereinbefore mentioned. Shaffer, Brown and Obert were introduced to defendant Hart, as prospective purchasers, by the plaintiff, and after making examination of the timber in company with this plaintiff and defendant Hart, they returned to White Sulphur Springs and began negotiations with Mr. Hart for the purchase of it. Not being financially able to buy the timber within themselves, a written option was taken on the same for thirty days at a cash price of $60,000.00, for which they paid $500.00, to afford them an opportunity to return to Pennsylvania and interest enough outside capital to close the deal. This fact was known to the owners of the timber. Finding it impossible to interest sufficient capital within the thirty day, Brown wrote Hart on September 8, 1924, as follows: "I feel as certain as can be that if we only have just a little time we can get this closed up which is our intentions

to do so if possible." On the next day he wrote Hart inquiring whether he would accept $40,000.00 in bonds and the balance of $20,000.00 in cash, and give sixty days in which to close the sale, offering $500.00 additional money for the extension. He stated that he and his associates "would be willing to enter into an agreement to make payments on these bonds before any issue became due by allowing $5.00 minimum per thousand feet of lumber", adding, "We expect to have Mr. Averill associated with us as he has signified his intention of going in with us." Hart in answer to these communications wired Brown on September 11, 1924: "Will accept thirty thousand cash balance stumpage we fix amount must have your check before we go any further will not accept your bonds proposition must have check and answer at once." Brown acknowledged this telegram in a letter of September 12, 1924, in which he assumed that the cash payment of $30,000.00 should be made sixty days after the draft to be drawn therefor with the deed, abstract of title and tax ticket attached thereto, saying: "We assume that your offer is to accept pay for the balance of purchase price by paying to you a certain amount on each thousand feet of lumber as it is manufactured until it is fully paid.  *  *  *  Make the deed to 'Little Creek Lumber Company', also draft and other papers attached and forwarded to 'Citizens National Bank' of Corry, Pennsylvania, which upon its arrival we will carefully look over and if everything is found to be alright which we assume may be the case, we will then prepare to honor draft when it becomes due.  *  *  *  We would be pleased to have your proposal on the stumpage basis in order that we may study it over; this we trust will be reasonable and not too burdensome for us to comply with." To this letter Hart replied on September 15th, saying: "Now this thing must be closed.  *  *  *  *We are going to allow you thirty additional days and if you have to have a week longer we will allow it.*  *  *  *  Now we must have $10.00 per M ft.  *  *  *  I think the only sensible thing to do is for you to come down and have your lawyer to go into it in detail." Brown replied to this letter, September 19th: "We have no objection to any of the changes you have suggested in your letter that I can

see at this time. I am very busy getting up a prospectus for our organization and are going to take it to the printer this morning with the view that we shall make a big success of our financial plans to put our company on a sound business basis from the very beginning. * * * As soon as we get our financing assured and on the way which I hope will be within a short time, it is our intention to go down to White Sulphur and attend to a lot of matters that I have in connection with this transaction and we can then go into detail about everything together so that they may be closed all up in a definite and mutually satisfactory manner I am sure.'' On October 3rd, Brown wrote to Hart that it might ''be several weeks yet before we will have our financing pledged and forthcoming and ready to go down to the tract to arrange all matters we will want to attend to.'' Hart replied to this on October 6th, saying: ''When you say several weeks that sounds rather indefinite to me. Now I don't want to deceive you, but you know it was against Mr. O'Farrell's will that I gave you the extension. While I am going to be fair * * * so do not bank on any further delay * * * I feel if you mean to close you should come down and get things lined up.'' October 16th, Hart sent the following written notice to Brown, Shaffer and Obert: ''Please take notice that after the 26th day of this month your sixty days will have expired, being thirty days given you on the first agreement and thirty days after that date.'' (Evidently overlooking the fact that he had given him an additional seven days.) Throughout these negotiations both Averill and Shaffer were in touch with Hart; Averill being all the while in the community in which Hart lived. During the time of the extension, Brown had endeavored to procure subscriptions for stock in the corporation which he proposed to organize for the purpose of taking over the timber, which corporation was never chartered.

Brown replied to Hart's notice on October 20th: ''It was a great surprise to us to receive such a notice from you as we fail to understand how you could arrive at any such conclusion'', and calling attention to his letters dated September 9th and 12th, and Hart's telegram of September 11th and letter of September 15th, concludes: ''We feel that you cannot

help but see that our time does not expire at the time you have stated.'' On October 25th, Brown wrote Hart regretting any misunderstanding and saying: ''I have just wired you as follows: 'The babe is born, its name means success, letter follows'; which means that we now have responsible party whose name in Fred W. Burnham, * * * Erie, Pa., who told Mr. Obert and myself yesterday that if you would make out the deed to 'Little Creek Lumber Company, Inc.,' attach all papers and make draft for sixty days time as specified in my letter to you of September 12th and which you accepted in your letter of September 15th, and forwarded to Citizens National Bank of Corry, Pennsylvania, that we would promptly make acceptance of same after examining the papers and prepare to honor same when due, with possibility of closing the deal long before this would become due. In so doing Mr. Burnham and myself immediately after these papers have arrived and examined the same at the bank would go to White Sulphur to look the timber over and make definite arrangements, if it is found as satisfactory as represented to him, to close up the deal at once and get ready for operating. * * * Our time absolutely is sixty days from the date of draft as mentioned in my letter of September 12th, and we are very confident Mr. Hart that any good attorney after examining our correspondence will confirm our stand in this matter, however, as stated to you in my letter of October 20th, it is not our aim to resort to any technicalities only as a case of emergency in protecting our rights, but instead we are anxious to close up the deal as soon as possible. * * * The amount of the draft will be thirty thousand less the eight hundred we have paid, also any stock that you may want to be deducted from this in addition. * * * You will not need to take the stock that you offered ($1,000.00) to deduct unless you want to do so, however, if you do want it or more of the preferred at ninety dollars a share for limited amount, I am sure that we will be pleased to have you do so which we think would give you safe return with good interest. If you will look up Mr. Burnham's rating in any of the standard commercial agencies, I am sure that his offer will insure your confidence in our successfully concluding the transaction

within a very short time." On October 27th, Hart telegraphed Brown: "Your new proposal rejected your time has expired if you wire me at once authorizing me to draw on you for my expenses to Corry and back and guarantee me at least ten thousand cash on purchase price on my arrival will take the deed to you unless I hear from you by wire complying my request will consider no other proposal." October 28th, Brown wired Hart: "Without waiving any of our rights under the sale agreement and without prejudice to ourselves you may come along with your papers as outlined in your telegram of the twenty-seventh." Later in the same day Hart wired Brown: "Your telegram not satisfactory unless you comply to mine insuring my expenses and ten thousand on my arrival we are bound to turn over timber to Averill and associates on expiration of your week grace which is November first." On October 30th, Brown brought Burnham from Pennsylvania in his own automobile to White Sulphur Springs to examine the timber, with the purpose of inducing him to take sufficient stock in the proposed corporation to enable Brown and his associates to close the purchase of the timber. On their arrival at White Sulphur Brown introduced Burnham to Hart, and the three men spent two days examining the timber and returned to Hart's home at White Sulphur on the evening of November 1st, where they met Mr. O'Farrell and discussed the sale of the timber. Brown and Hart do not agree as to what took place at this conference. Hart testifies that Brown, after being informed by Burnham that he would not go in with them (Brown, Shaffer and Obert) and that he would reimburse them for their option money, stated that he (Brown) and his associates had no further interest in the timber and that Burnham was at liberty to buy it for himself. Brown denies this conversation. Brown, Burnham and Hart went to Lewisburg on the next day, November 3rd, for the purpose of having a deed made for the timber. The deed was made direct to Burnham. Brown says that this was done without his knowledge; that he did not learn of the fact for a week later.

According to Averill, he, at Hart's suggestion, went to Corry, Pennsylvania, sometime in October to try to assist

Brown, Shaffer and Obert in any way he could in closing the deal. He found that they had the situation pretty well in hand, and he so reported to Hart on his return. Hart kept after him all the time and in order to scare him threatened that he had other prospectors to bring on the job. He stated that on Sunday, November 2nd, Hart sent his son to him at his hotel at White Sulphur, urging him to come immediately to Hart's home on important business. He complied with the request, and when he reached Hart's home, Hart urged him to get in touch with Burnham immediately and not to let him escape, as Hart was of the opinion that Burnham was the man with money sufficient to make the desired purchase. Averill then sought out Burnham and spent nearly the whole day with him, during which time he discussed the timber and used every effort to stimulate Burnham to make a purchase and to hold things in line till the deal could be closed. While Hart says that he does not remember sending for Averill, or seeing them together on Sunday, he nevertheless does not deny that the meeting between Burnham and Averill took place on that day. Nor does Burnham deny it. Hart's son, who Averill says carried the message, did not testify. Burnham paid the $60,000.00 for the timber, that being the amount agreed upon in the option taken by Brown and his associates. It was also agreed between Burnham and Hart that the $800.00 paid by Brown and his associates on the option be credited on the purchase price for the timber. Averill further testified that as soon as he and Hart received the information that Burnham was interested, from Brown, they got together and examined Burnham's rating in the commercial agencies, which they found to be high. Further it appears that Averill made Shaffer a sub-agent to sell the timber under a promise to be given one-half of the commission which Averill was to receive. Averill was present when Hart sent the telegram to Brown on October 28th, stating that his telegram was not satisfactory and that he would turn the timber over to W. E. Averill and associates on November 1st, and that Hart told him at that time that—"Whenever Burnham comes down and finds you here he will figure that this was done just to get him down, and the best thing you could do is

not to meet Burnham until after the deal is consummated.''
Averill further testifies that Hart told him that as soon as he
got his payment from Burnham that they would get together
and straighten up, and that he (Averill) told Hart that he
was suffering no uneasiness in regard to settlement and it
ran along for a few days or weeks, when Hart began to pass
him on the street or dodge him. Hart denies all this. There-
upon Averill brought his suit.

On the trial the plaintiff obtained judgment and the de-
fendants have appealed. The errors relied on for reversal
are: (1) Admission of improper evidence; (2) prejudicial re-
marks of the trial judge before the jury; (3) refusal of de-
fendants' instructions; (4) the court giving on its own motion
a charge to the jury; and (5) overruling motion to set aside
the verdict and grant a new trial.

The plaintiff introduced H. L. VanSickler as a witness in
his behalf, who testified that Hart had made the statement to
him in a conversation after the deal was closed that ''Averill
was to have a commission.'' This was objected to by the de-
fendants as being a confidential communication between attor-
ney and client. The objection was later sustained by the court
and the objectionable evidence stricken from the record and
the jury directed to disregard it. It is claimed that it was so
prejudicial that its subsequent withdrawal could not cure the
error. This might be true in cases where the evidence was
evenly balanced on the material point to which the objection-
able evidence tended to prove, or where the evidence tended to
overbear the verdict. That is not the case here. Counsel for
the defendants in a measure destroyed any prejudicial effect
by offering before the jury to introduce evidence showing that
such conversation did not take place.

Another error urged is that Averill was allowed to testify
that Hart told him that they would ''try and get together and
make a settlement,'' and other statements of like effect. That
this testimony related to a compromise and should have been
excluded under the rule that testimony offered to show an
unaccepted offer of compromise is incompetent and inadmis-
sible. *Howell* v. *McCarty,* 77 W. Va. 695. It appears that
these statements were made by Hart to Averill upon Averill

making demand that Hart pay him his commission.  Nor does it appear that there was in fact any attempt to effect any compromise between the parties.  The statements of Hart testified to by Averill were admissible under the well established rule that the declarations of parties to the suit against interest may be shown in evidence.  *Smith* v. *Townes,* 4 Munf. 191; *Lovett* v. *Gas Co.,* 73 W. Va. 40; *Insurance Co.* v. *O'Grady,* 115 Va. 830; 16 Cyc. 984; 22 C. J. 353; Jones on Ev., § 236.

Divers remarks of the trial judge in the progress of the trial in the hearing of the jury are complained of by the defendants.  Some of these remarks were made merely in an effort to speed the trial.  We see nothing to criticize in such remarks.  The two remarks most stressed are: (1) ''This case, it seems to me, has narrowed down to a single issue, whether or not the plaintiff was the procuring cause that brought about the condition out of which the sale grew''.  And (2) ''Now the question seems to me whether or not the plaintiff is the procuring cause.  There is no question about the sale being made.  Now if these gentlemen recover at all they must recover on the sale to Mr. Burnham, and Mr. Averill's connection therewith either personally or individually or through the influences he had, if the sale is the result of the influences he had, he then is the procuring cause.''  We are not unmindful of the fact that it is not proper for the court to give an oral instruction to the jury, governing the matters in issue in a civil case, even though the instruction be correct as a matter of law.  *Henderson* v. *Kessel,* 93 W. Va. 60.  The remarks quoted do not come within the purview of those condemned by this court in *State Road Commission* v. *Young,* 100 W. Va. 394.  Any misinterpretation of the law in these statements would be cured by a proper interpretation thereof given later in its charge to the jury.  These remarks made no indication of the court's opinion of the merits of the case, as in the case last cited.  They merely amounted to an attempt to define the issue and to prevent the introduction of irrelevant matters into the trial.  While we cannot say that the court erred in this instance, we again give our approval to the salutary rule announced in *State* v. *Willey,* 97 W. Va. at page 261: ''The

influence of the court over its juries is so apparent and so well recognized that, to preserve the jury system in its ancient vigor and splendor as the sole arbiter of fact, the judiciary should studiously and jealously refrain from impressing, in any manner, on the jury its view of fact, or the weight or credibility it would give to testimony.''

The refusal of the court to give the defendants' instructions in the language as offered, though embodied in substance in a charge given by the court, is earnestly stressed by the defendants as error.  Section 22, Chapter 131, Code, provides that: ''In lieu of the giving of separate instructions * * * the court may in writing instruct upon the law governing the case, putting such instructions in the form of an orderly and connected charge, incorporating therein the substance and as far as may be, the language of the instructions prayed upon either side or prepared by the court on its own motion, with correctly propounded law applicable to the case.'' The gist of the defendants' complaint may be seen from their objection to the modification of instructions Nos. 1 and 6.  They are: (1) ''The court instructs the jury that before the plaintiff can recover commissions from the defendants in this case it must appear to the jury from a preponderance of the evidence that the efforts of the plaintiff, Averill, were the direct and procuring cause of the sale of defendants' timber.''  And (6), ''The court instructs the jury that you would not be justified in awarding a verdict for commissions to the plaintiff in this case merely because the defendants succeeded in selling their timber, but before awarding a verdict for commissions to the plaintiff you must find that the sale made was the direct and proximate result of his efforts or was made to a purchaser furnished or introduced to the defendants by the plaintiff.''  In the sixth instruction the court struck out the words ''direct and proximate''.  The first instruction was given in tact in the charge as follows:  ''It is therefore a question for you gentlemen of the jury, in this case to decide whether the plaintiff's efforts were the direct and procuring cause of the sale of the defendants' timber.''  Thus it is seen that, as regards the sixth instruction, the only word omitted is ''proximate''.  The court in its charge stated

the alternative: "And if you find from the evidence that the effort of some person or persons other than the plaintiff or his agents were the procuring cause of such sale, then you should find for the defendants." This clearly states the issue.

What is the law of the case? In this and like cases, as the authorities practically agree, if the real estate agent or broker is the procuring cause of the sale, he is entitled to the commission agreed upon, or to recover for his services on the *quantum meriut.* This is true even though the sale is made by the owner directly to the purchaser without the intervention of the broker. *Arents* v. *Casselman,* 110 Va. 509; 23 Am. & Eng. Enc. L. (2nd Ed.) 911; *Henderson* v. *Vincent,* 84 Ala. 99; *Wilson* v. *Sturgis,* 71 Cal. 226; *Hawkins* v. *Chandler,* 8 Houst. (Del.) 434; *Hafner* v. *Herron,* 165 Ill. 242; *Blodgett* v. *Sioux City, etc.,* 63 Ia. 606; *Dreisback* v. *Rollins,* 39 Kan. 268; *Schwartze* v. *Yearly,* 31 Md. 270; *French* v. *McKay,* 181 Mass. 485; *Douville* v. *Comstock,* 110 Mich. 693; *Haug* v. *Haugan,* 51 Minn. 558; *Fisher Realty Co.* v. *Staed Realty Co.,* 159 Mo. 563; *Butler* v. *Kennard,* 23 Nebr. 357; *McKnight* v. *Thayer,* 21 N. Y. Sup. 440; *Peckham* v. *Ashurst,* 18 R. I. 376; *Scott* v. *Clark,* 3 S. D. 486; *Royster* v. *Mageveney,* 9 Lea (Tenn.) 148; *Hoefling* v. *Hambleton,* 84 Tex. 517; *Barnes* v. *Savings Society,* 21 Wash. 448; *Bell* v. *Siemens,* 101 Wis. 320.

There is no attempt to define what constitutes "procuring cause" in the instructions of the defendant or in the charge of the court, unless the latter part of the charge in which the facts stated, leading to the conclusion that a verdict should be directed for the defendants, amount to that. It is not necessary that such efforts of the broker be the sole cause. *Handley* v. *Shaffer,* 177 Ala. 636. Procuring cause and approximate cause are substantially, if not quite, the same in meaning. Proximate cause as "that which in a natural and continual sequence, unbroken by any new cause, produces an event, and without which the event would not have occurred." Bouvier's Dictionary; *Smith* v. *County Court,* 33 W. Va. 718; *Butcher* v. *Railroad Co.,* 37 W. Va. 191. But, admitting a shade of difference, it would be too much of a refinement to hold that the omission of the latter term would be error. *Bagley* v. *Foley,* 82 Wash. 222. The broker is the procuring

cause of the sale within the rule, if he brings it about by his exertion, or advertisement. 23 Am. & Eng. Enc. L. (2nd Ed.) 910. Where a broker who has property for sale for his principal advertises it and gives information about it to a third party who communicates such information to a friend, and the friend afterwards buys direct from the principal, the broker is entitled to his commission. *Lincoln* v. *McClatchie,* 36 Conn. 136. The expression ''procuring cause'' as used in the books refers to the cause originating a series of events, which, without break in their continuity, result in the accomplishment of the prime object of the employment of the agent which, as stated, is the procurement of a purchaser ready, willing and able to buy the land on the principal's terms. *Park* v. *Culver,* 169 Mo. A. 8. The purchaser here being accepted by his principal dispenses with the necessity of showing that the purchaser was able, ready and willing to buy, since acceptance is taken as conclusive evidence of that fact. *Cooper* v. *Upton,* 60 W. Va. 648; *Royster* v. *Mageveney, supra; Wray* v. *Carpenter,* 16 Colo. 271; 25 A. S. R. 265; *Davis* v. *Morgan,* 96 Ga. 518.

So, we conclude, the rule of reason, which seems to be supported by all of the authorities on the subject, is that the broker is entitled to his commission, although he may not have conducted all of the negotiations leading to the sale; it being sufficient if he set in motion the machinery by which the work was done, which without break in its continuity, was the procuring cause of the sale. Whether or not this was the case is, of course, a question of fact for the jury. *Shea Realty Corp.* v. *Page,* 111 Va. 490; *Rosenfield* v. *Wall,* 94 Conn. 418.

The court's charge as a whole was a correct statement of the law of the case. It was not, therefore, error to fail to include the instructions in the identical language in which they were offered, conceding them to be correct statements of the law and applicable to the issues. It clearly appears that the defendants employed the plaintiff to make the sale; that Obert, Brown and Shaffer (of whom Shaffer was a subagent of the plaintiff), took an option on the property; that in the endeavor to secure means to buy the property, they interested Burnham and took him to see the property, with the result for

some reason the sale was made to him. As we view the case it matters not for what reason. Burnham merely slipped into the shoes of Brown, Shaffer and Obert. The prime object of the contract entered into between Hart and Averill had been accomplished—a sale of the timber. There was no break in the continuity of the cause set in motion by Averill originating a series of events leading up to its accomplishment. Within all the authorities this was sufficient to constitute the plaintiff the procuring cause of the sale. After Averill had "shaken the tree" the defendants seek to deprive him of his rightful share, under the contract, of the fruit. The evidence in his favor is so preponderant that the lower court within its rights might have directed a verdict.

*Affirmed.*