# CHARLESTON.

CHARLES W. H. CRANE *v.* A. J. DALTON *et al.*

(No. 5626)

Submitted October 5, 1926.    Decided November 9, 1926.

1.  CONTRACTS—*In Action Upon Contract for Recovery of Money Plaintiff Limited to Issues Presented by Pleadings.*

    In an action upon a contract for the recovery of money, the plaintiff will be limited to the issues presented by the pleadings.    (p. 556.)

2.  SAME—*Where Contract of Copartnership for Purchase and Sale of Real or Personal Property for Profit Contains Option in Favor of One or More of Parties to Purchase Interest of One at Stipulated Price to Exclusion of Optionor if He or They Elect to do so But no Time Limit Fixed, Request of Optionees That Optionor Join in Conveyance to Third Person for Particular Purpose Will Not Amount to an Election by Optionee to Take Property.*

    Where a contract of copartnership for the purchase and sale of real estate or personal property for profit also contains an option in favor of one or more of the parties to purchase the interest of one of them at a stipulated price per acre, and to the exclusion of such optionor, if he or they elect to do so, but no time limit is fixed for the exercise of such option, the subsequent request of such optionees that the optionor join with them in a conveyance of the land to a third person for a particular purpose, as the raising of money by mortgage, or the sale of the property for the benefit of the parties, or for some other purpose, will not in law amount to an election by the optionees to take the property under the option.    Acceptance of the option under such circumstances will not be implied from the bare request for a

deed for the purposes stated: the burden of showing such an election in fact will rest upon the optionor.   (p. 564.)

3.  SAME—*Where Purposes of Such Conveyance to Third Persons Failed and Managing Partners Without Knowledge or Consent of Other Party Direct a Sale and Conveyance to Another for Purpose of Raising Money to Pay Off Liens Created for Purchase Money and Other Purposes of Joint Undertaking, Such Sale and Conveyance Will Not Constitute an Election by Managing Partners to Take Property Under Their Option and Bind Them to Pay the Stipulated Price, and the Limit of Recovery Will be Damages Sustained by Plaintiff.*

Where the purposes of such a conveyance of real estate to such third person failed, and the managing partners subsequently and in order to pay off the liens thereon created for the purchase money, and without the knowledge or consent of the other party direct a sale and conveyance of the property to another, for the purpose of raising money to pay off such indebtedness and for other purposes of the joint undertaking, such sale, direction and conveyance will not constitute an election by such managing partners to take the property under the option and bind them to pay the optionor the full sum stipulated.   In such a case the limit of recovery will be the damages sustained by the plaintiff.   (p. 554.)

4.  JURISDICTION—*Unsettled Partnership or Trustee Account Generally Cognizable in Court of Equity.*

A suit upon an unsettled partnership or trustee account is generally cognizable only in a court of equity.   (p. 565.)

Error to Circuit Court, Cabell County.

Action of assumpsit by Charles W. H. Crane against A. J. Dalton and others.   Judgment for plaintiff, defendants bring error.

*Reversed; verdict set aside; new trial awarded.*

*Rolla D. Campbell, Fitzpatrick, Brown & Davis,* for defendants in error.

*E. L. Hogsett, Holt, Duncan & Holt,* for plaintiff in error.

MILLER, JUDGE:

In an action of assumpsit upon an original and an amended declaration, with general and special counts, and with bill of

particulars attached, and upon issue joined upon defendants' general plea of non assumpsit, and specification of set-off or counterclaim, the plaintiff, on November 14, 1925, obtained a verdict and judgment against the defendants for $122,500.00, with interest and costs.

The cause of action as pleaded arose out of a contract, dated April 18, 1922, between plaintiff and defendants, relating to about 49,836 acres of land in fee and mineral and timber rights, known as the Cole and Crane lands, situate in Wyoming County, which contract took the form of a declaration of trust by the plaintiff Crane, declaring that being the holder of a six months' option, taken for himself and Dalton and Kelly from the trustees of said Cole and Crane lands, he held said option in trust for himself and them, and that they each had an equal one-third interest therein. The agreement, signed and sealed by all three of the contracting parties, by the fifth paragraph thereof, provided that the same should not only cover the option thereinbefore described, but also any modifications thereof, or any other option that might thereafter be taken by said Crane, as trustee, in lieu thereof. The option referred to in the contract recited no consideration, or terms of payment, or other terms. Later, however, namely on May 9, 1922, Crane, by a proposal in writing addressed to the trustees of the Cole and Crane Real Estate Trust, and their acceptance of the offer, obtained from them an option for six months, on the terms of $1,000,000.00, $5,000.00 down for the option, and $995,000.00 in cash at the time such option should be consummated within the time limit thereof. This option, therefore, by the terms of the contract or declaration of trust of April 18, 1922, and the provisions of the fifth paragraph thereof, came concededly under the terms and provisions thereof, and to be controlled thereby.

The special provisions of the contract of April 18, 1922, relied on as constituting the basis of the present action, and as controlling the rights of the parties, are the third and fourth paragraphs thereof, as follows:

   "(3) In the event the parties hereto should desire, or find it to be necessary, to take any other

person, or persons into their syndicate, and share with him, them or it, any profit that might arise from the purchase and disposition of said lands, each of the parties hereto, that is to say, Crane, Dalton and Kelly, shall relinquish his proportionate part of his interest in said option, upon such terms as may be agreed upon between them, to the person, persons or corporation, that may become so interested as aforesaid in said option.

" (4)   In the event the option aforesaid is exercised by the parties hereto by the purchase and taking over the land herein described, and the said Dalton and the said Kelly should thereafter desire either to hold, develop and operate the property, or sell the same, or interest other parties therein with them other than said Crane, and to his exclusion, they shall have the right to purchase of the said Charles W. H. Crane his interest in the same at $5.00 per acre, the terms of the purchase to be then agreed upon.''

Averments of the special counts in the original and amended declarations are, that on October 16, 1922, plaintiff and defendants elected to and did purchase the lands described in said option, and that on October 16, 1922, they took a conveyance thereof executed by the said optionor to plaintiff as trustee for himself and Dalton and Kelly; that said property was held by plaintiff and the defendants jointly under said deed until November 1923, at which time, it is alleged in one count, defendants with their business associates, caused to be organized under the laws of West Virginia the Main Island Coal Corporation, in which plaintiff was in no way interested and held no capital stock, but in which the defendants were largely interested, and that they then elected to exclude plaintiff from his interest in said property, and as provided in said contract requested and required of him that he convey his interest in said property to said corporation, which he did, on November 14, 1923, his wife joining therein, upon the consideration and promises of the defendants that they would pay him therefor the sum of $5.00 per acre as stipulated in the contract, which they had neglected to do, and that being so indebted to plaintiff, they thereafter, on December 31, 1923, promised and agreed to pay him.

In another count it is alleged that defendants conceived and proposed the plan of consolidating said properties with others which they owned or controlled, and to borrow large sums of money, evidenced by bonds, and out of the proceeds thereof to pay plaintiff the sum of $5.00 per acre, as provided to be paid him in said contract of April 18, 1922, and that pursuant to said plan, defendants, with their associates, unknown to plaintiff, organized a corporation by the name of Main Island Coal Corporation, of which plaintiff was neither a corporator or a stockholder, or in any wise connected, but that defendants were largely interested as stockholders therein; and that for the purpose of facilitating their said plan, and perfecting such loan, and to pay him said sum of $5.00 per acre as agreed, and at their request, plaintiff, his wife joining therein, executed, acknowledged, and delivered to defendants a deed conveying said property and all of his interest therein to the Main Island Coal Corporation, with the understanding and agreement that the said deed when executed also by defendants, was to be used and delivered to said company solely for the purpose of borrowing upon the consolidated properties a large sum of money, and that when so borrowed, to pay plaintiff the sum of two hundred and forty-nine thousand, one hundred and eighty dollars, being five dollars per acre, over and above the purchase price and interest, and the expenses incident to said purchase, and the conveyance charges, but that in violation of said agreement, said defendants delivered said deed to said Main Island Coal Corporation, and appropriated the whole of the purchase money thereof to themselves, whereby and by reason whereof, they became liable and indebted to plaintiff for the reasonable value of his interest in said property, which said interest was reasonably worth the sum of five dollars per acre, aggregating in all the sum of two hundred and forty-nine thousand, one hundred and eighty dollars over and above the purchase price thereof, and the expenses incident to said purchase, and the conveyance charges thereof; and that being so indebted, defendants thereafter, on December 31, 1923, undertook and faithfully promised to pay him the said sum of two hundred and forty-nine thousand, one hundred and eighty dollars, whenever thereunto requested.

In a third count it is alleged that in violation of said trust agreement to purchase, hold and develop said property, to the exclusion of plaintiff, and in violation of the terms upon which plaintiff and his wife had joined in said deed to the Main Island Coal Corporation, defendants on December 15, 1923, had caused and permitted said corporation to make, execute and deliver to the W. M. Ritter Lumber Company a deed for the said property, with other properties, for the price of $1,800,000.00, which said sum defendants had received, held and appropriated to their sole use and benefit, whereby they had become liable and indebted to plaintiff in the sum of five dollars per acre for said property, in the aggregate two hundred and forty-nine thousand, one hundred and eighty dollars; but that they and each of them, not regarding their said promises and undertaking in the several counts of the declaration mentioned, had not paid plaintiff the several sums of money due him as aforesaid, or any part thereof, although often requested to do so, but had wholly neglected and refused, to the damage of plaintiff, two hundred and seventy thousand dollars, wherefore he sues, etc.

The only bill of particulars accompanying the declaration is as follows:

"A. J. Dalton and John A. Kelley,
          To Charles W. H. Crane, Debtor.
To $5.00 per acre due the plaintiff for his interest in lands and minerals situate in Wyoming County, West Virginia, and aggregating 49,836 acres, under and by virtue of a certain agree ment dated April 18th, 1922, between said plaintiff and said defendants.........................$249,180.00
(Signed)  CAMPBELL & CAMPBELL,
               FITZPATRICK, BROWN & DAVIS,
                                                P. Q."

So that, the basis of plaintiff's action, as pleaded, is, that defendants under paragraph 4 of said contract, had elected to associate others with them in holding, developing or operating said property, to the exclusion of plaintiff, or to purchase from him his interest therein, upon the terms alleged to have been agreed upon and set out in the declaration, and in viola-

tion of the agreement alleged in the said several counts, had disposed of said property to others, and had appropriated the whole of the purchase money; and the parties went to trial upon the issues joined on said pleading, except only that defendants gave notice in writing, filed with their plea of non assumpsit, that they would defend and give evidence and would insist that plaintiff was still indebted to them by way of recoupment, in the sum of $431,944.55, or $427,368.04, as shown in the several items of the account stated in two separate notices.

These notices of defense and recoupment are predicated on the theory that the plaintiff was jointly interested with defendants in the purchase of said lands, including other lands purchased and consolidated therewith, especially what is known as the Barnsdall lands of 17,000 acres, and was indebted to them for one-third of the purchase price paid therefor, and the interest and taxes thereon.

At the conclusion of the trial, defendants moved the court in writing to set aside the verdict of the jury and to grant them a new trial, on the ground, among others, that the verdict was contrary to the law and the evidence, specifying in detail the various other grounds relied on, involving the admission and rejection of evidence, and the granting and refusing of the several instructions to the jury proposed by the respective parties, one of them being that the verdict was not justified upon any theory of the case as presented by the evidence.

Th first proposition for reversal is, that the trial court erroneously permitted the plaintiff to detail the antecedent negotiations between the parties leading up to the contract of April 18, 1922, and thereby to attempt to alter or contradict the terms thereof. The position of plaintiff's counsel, and no doubt that of the trial court, was that the evidence was admissible for the purpose of showing the situation of the parties, and the facts and circumstances surrounding them at the time of entering into the contract. Elaborate arguments are presented here by counsel on both sides in support of their respective positions on this subject. But the conclusion we

have reached renders it unnecessary for us to respond thereto, either for the purpose of the present hearing, or for the purpose of a new trial to be awarded.

The questions we are to deal with on this occasion must be limited to the issues presented by the pleadings and the proofs aplicable thereto; and as we conceive them, they do not involve any question respecting the duty or obligation of the plaintiff to contribute to the payment of the purchase money, or interest, taxes or other expenses accruing against the property, matters covered by the oral evidence of the plaintiff, excepted to. Plaintiff has sued, not for a settlement of his trusteeship, or any joint or partnership accounts, which might involve payment of purchase money or expenses incident to the ownership of the property, but for $249,180.00, alleged to be owing to him by defendants on the several theories pleaded: First, that under said paragraph 4 of the contract, defendants elected in November 1923, to exclude plaintiff from his interest in the property, and require of him that he convey the same to the Main Island Coal Corporation, which he did on November 14, 1923, and received no part of the purchase money paid by said company, whereby, it is alleged, the defendants became indebted to him in the price of $5.00 per acre, as provided in the contract; Second, that for the purpose of aiding and facilitating the plan of defendants to consolidate this property with other property, as alleged, and to raise money by a mortgage thereon, and to pay him $5.00 per acre, as per the terms of the contract, he and his wife executed, acknowledged and delivered the deed to the Main Island Coal Corporation, with the distinct understanding and agreement that the said deed when executed by the defendants was to be used solely for the purpose aforesaid: Third, that in violation of said agreement, defendants, for the purpose either to hold, develop or operate the property, or to sell the same, or to interest other parties therein with them, to plaintiff's exclusion, they delivered said deed to said company and received and appropriated to themselves the entire purchase price thereof, and which company had later, on December 15, 1923, conveyed the property, with other proper-

ties, to the W. M. Ritter Lumber Company, for $1,800,000.00, whereby they had become indebted to plaintiff in the sum of $5.00 per acre, stipulated in the contract.

Upon a careful consideration of all the evidence in the case, we are convinced that the plaintiff has totally failed to make out his case upon either of the theories presented by the pleadings. On the first theory, that the defendants elected to buy only plaintiff's interest and to pay him $5.00 per acre therefor, there is no evidence of any such unqualified election or agreement. Plaintiff's evidence makes clear the fact that any agreement made between the parties in connection with the deed of November 7, 1923, involved the success which the parties through the Main Island Coal Corporation might have in obtaining a loan secured by a mortgage on the property. His contention was that their promise was absolute, but that he was to await payment until the bonds should be sold, which it was anticipated would be about January, when he was to be paid $5.00 per acre for his interest. And in support of this theory he introduced and relied on a letter from E. L. Hogsett, defendants' attorney, advising him that at a meeting of the directors of the Main Island Coal Corporation, held on November 6th, the corporation had taken over all the lands purchased by Dalton and Kelly including that portion held by Crane as trustee, and had assumed payment and had agreed to pay the balance of all unpaid purchase money against the same, and enclosing for execution by Crane and wife said deed, and further advising him that the execution of the same would in no way waive, modify or change Dalton's obligation to him to pay him a sum of money for his interest and services. Hogsett, who wrote the letter, was not fully advised about the contract of April 18, 1922. He had not seen it, and was writing solely under information he had from the parties to the contract, and not of any specific promise of Dalton's to pay Crane. His purpose was to assure Crane that his interests would be protected, whatever they were. Plaintiff's contention now is that the purpose of the deed of November 7, 1923, was to exclude him from all further participation in the property, and that defendants had thereby bound them-

selves unconditionally to pay him $5.00 per acre for his interest therein. If such was the purpose of this deed, what were the terms of payment, cash or credit? Plaintiff does not even pretend that payment, or the terms of payment, were ever discussed or agreed upon. Nor does it appear that payment was ever demanded of the defendants. Naturally, before making, and certainly before delivering, such an important paper, the plaintiff would have demanded and secured some evidence of the purchase money, cash or notes, and some security for his money. His interest in the property by the terms of the trust was a one-third undivided interest therein. The fact that Dalton and Kelly paid or provided for the payment of the purchase money in the beginning does not militate against defendants' contention that until they elected to exclude plaintiff and be bound for his share of the purchase money and expenses of marketing the property, they assumed no obligation to or for him. Crane had no money.

And how inconsistent is the first theory of recovery with the second, namely, that when plaintiff joined defendants in the said deed, it was not to part with his interest finally, but to further a plan of consolidation and the raising of a large sum of money on the properties by sale of bonds secured by mortgage, and the payment to him out of the proceeds thereof the sum of $5.00 per acre. At the date of this deed there existed a deed of trust on the property in favor of a bank in Cincinnati, Ohio, for $500,000.00 of the purchase money, and the property was indebted to Dalton and Kelly for a like amount, constituting practically the whole amount of the purchase price. The main purpose was to raise the money to pay off this indebtedness. The record shows that the parties were not successful in floating the contemplated loan. Another loan was negotiated on another deed of trust in favor of the Fifth-Third National Bank, of the same city, the plaintiff having joined in the two notes of $250,000.00 each; and when the property was sold to the W. M. Ritter Lumber Company, it was about to be sold to pay off the second loan. The first venture had proved unsuccessful, and Dalton and Kelly were endeavoring to sell and save themselves and Crane from impending disaster.

It is no argument in favor of Crane's contention, that Dalton and Kelly paid or provided for the purchase money in the first instance, or, if the fact is, agreed to do so, for the reason suggested, or allowed him his expenses, some $4,000.00 or more, in his effort to sell the property; his interest, at least up to the time of their alleged election to take over his interest, was fixed by the terms of the contract, as a one-third undivided interest; and on that basis, and that alone, he would have to settle. The conveyance, joined in by all the parties, to the coal company, made that company trustee for the parties, the property remaining subject to the trust in favor of all three. Even the resolution of the board of directors evidencing the transaction, showed the company was to take over the property and to assume and pay the balance of the purchase money; but this company and this transaction were absolutely controlled by the same parties, and the property remained subject to the trust: it was only a means to a desired end. In the meantime the Barnsdall property had been purchased in the name of Dalton, and that property was included in the scheme to borrow money; and while the resolution recites that stock was to be issued to Dalton and Kelly for the amount of the money invested by them, no stock was in fact issued or taken by them. The paper transaction was for the sole purpose of securing a loan on or a sale of the property for the benefit of all, as fixed by the original contract. True, by that contract Dalton and Kelly might at any time eliminate Crane by electing to pay him the $5.00 per acre, as stipulated in the contract; but, as we have said, no such election was made. Payment of $5.00 per acre to Crane was conditioned on their being able to float a loan or to sell at a sufficient profit to justify the payment of $5.00 per acre to him. It was not until late in October 1922, that the parties elected to avail themselves of the option of May 9, 1922, by taking over the Cole and Crane property; and after that all were more or less active in trying to dispose of it at a profit. In the meantime, June 3, 1922, they had given an option, first as individuals, and on June 6, 1922, through a company organized by them as the D. K. C. Coal Company,

to Farquhar and Hallanan, for ninety days, for the purchase of the property at the price of $75.00 per acre, which, if taken, would have netted them a handsome profit. After that, as before, Crane was active in endeavoring to sell the property and to raise money by mortgage thereon, and also aided the other parties in an effort to sell it to the W. M. Ritter Lumber Company. On October 2, 1922, he wrote Dalton, advising him of the necessity of obtaining the Barnsdall lands and rounding up an acreage to complete a solid boundary, so as to attract purchasers; and in May 1923, after the unsuccessful efforts made to raise money by mortgage or by a sale of the property or of the timber, he became active in an effort to dispose of the property to the W. M. Ritter Lumber Company, shown by his letter to Dalton of May 15, 1923. On August 6, 1923, Crane gave an option to Dalton individually for ninety days, to buy his interest at $250,000.00, of which $25,000.00 was to be paid down, and $25,000.00 each six months thereafter until the whole sum was paid. This option had just expired when he joined with Dalton and Kelly in the deed to the Main Island Coal Corporation, of November 7, 1923, which he claims was an election by Dalton and Kelly to take over the property to his exclusion and bound them to pay him $5.00 per acre for his interest, his claim being that the deed was made pursuant to an agreement with Dalton to that effect. And to confirm or establish this theory of right to recover, he relies on the letter from Hogsett, attorney for Dalton, enclosing him the deed, and his conversation with Hogsett over the telephone from Cincinnati, Ohio. Dalton says his talk with Crane was at a luncheon at Huntington, in the presence of Hogsett and John Grosenback; that he did not then or at any time agree to pay Crane $5.00 per acre for his interest, but that as Crane was about to go to California, and for the purpose of convenience in negotiating a loan, he called upon Crane and Crane agreed to join in a conveyance to the coal company for that purpose; that at the luncheon afterwards, Crane called upon him and Hogsett to know whether his execution of the deed would destroy his interest in the property, and was then, as afterwards over the

telephone, advised by Hogsett that it would not. Hogsett confirms this version of the understanding; and Grosenback says that afterwards he met Crane in Cincinnati, when referring to the property Crane told him he was not going to sell his interest, but was going along with Dalton and Kelly, and either make a lot of money, or none at all; and Hogsett says in explanation of his letter to Crane enclosing the deed, that it was written when Dalton and Kelly were both away from home, at which time he had not seen the contract of April 1922, but understood there were some contractual relations between the parties respecting the property, and as he afterwards explained to Crane, his joining in the deed with Dalton and Kelly would not affect his interest in the property, which was as he understood a one-third interest. Nor do we think the subsequent sale of the property, including the Barnsdall lands, through the agency of the Main Island Coal Corporation, amounted to an election of Dalton and Kelly to exclude Crane, and pay him $5.00 per acre for his interest. That sale was born of necessity in order to save all parties from loss of the entire property by foreclosure of the deed of trust in favor of the bank holding the notes of all the parties. A point of argument made by counsel for Crane against the theory that Crane's interest was a one-third interest in the property, was the supposed absurdity of his agreeing to sell at $5.00 per acre, when his liability on the theory of a one-third interest required him to pay one-third of the purchase price, $1,000,000.00, or over $330,000.00. The answer to this is that the contract defined his interest as a one-third undivided interest; and his option to sell to Dalton and Kelly at $5.00 per acre and be excluded from further participation in the profits of the venture, was entirely consistent with their theory, for in the event of their purchase of his interest, they would have to take it *cum onere,* of course, with the burden of the purchase money on it. This they concede; but where is the evidence of Dalton and Kelly's election to take such a burden. We fail to find in the record evidence justifying this theory. Certainly, it can not be legally inferred from Crane's joining in the deed with Dalton and Kelly to the Main Island

Coal Corporation.  As we have observed, the effect of that deed was simply to transfer the trusteeship from Crane to the coal company.

Passing by the exceptions to the admission of oral evidence as tending to vary or contradict the terms of the original contract of April 18, 1922, and containing the option given to Dalton and Kelly to buy out Crane, for the reasons assigned, we come to the first point of error to be considered, namely, the giving of plaintiff's instruction number 2.  In substance it told the jury that if Dalton and Kelly, through Dalton, or through Hogsett's letter to Crane of November 7, 1923, had requested that Crane join in the deed to the coal Company, such request or requests as a matter of law constituted an acceptance or the exercise by Dalton and Kelly of the option contained in paragraph 4 of the contract, unless the contrary was made to appear by an express agreement.  Crane knew that when he joined with Dalton and Kelly in the deed to the coal company, which had been organized for a particular purpose, that they were not exercising any rights under the option, or for the purpose of excluding him, and he declined to execute it until answered by Hogsett that it would not affect his interest.  Nor was there any intimation given Crane, prior to or in the Hogsett letter, that Dalton and Kelly, or either of them, were exercising any rights under the option contained in the contract.  No reference was made thereto.  All the parties, including Crane, understood that the transfer of the property to the coal company constituted a mere continuance of the trust for Dalton, Kelly and Crane. · If, as in the cases cited by counsel, the court had been dealing with a purely optional contract and the optioners were calling for a deed, that action could be interpreted in no other light than as intended to exercise the option; and as those cases hold, the election would be implied as a matter of law. *Barrett* v. *McAllister*, 33 W. Va. 738; *Crowley* v. *Vaughan*, 88 W. Va. 223; *Turner* v. *McCormick*, 56 W. Va. 161.

In the case at bar, however, the parties stood not alone in the position of optionor and optionees.  They had embarked in a joint venture of buying and selling lands for profit.  Each

had a third interest in the property purchased, and although the contract also contained the option, their conveyance to the coal company was at the request of two of the parties, and not as a matter of law the exercise by the optionees of any right under the option; and the burden was upon plaintiff to show that the proposition to convey to the coal company was an exercise of the option. In our opinion he has wholly failed to sustain the burden, and that the instruction submitted to the jury contained an incorrect legal proposition. The circumstances surrounding the parties at the time render it extremely unlikely that after the unsuccessful efforts of all of the parties prior to that time to raise money or to procure a purchaser, Dalton and Kelly, in the face of impending loss, would at such a moment assume the burden of a greater loss of $250,000.00, by electing to take over the property unconditionally, as the plaintiff and his counsel now contend was the fact.

Another point made by counsel against instruction number 2 is that it wholly ignores the effect of the later contract, nominally between Dalton individually and Crane, of August 6, 1923, and which they say was to wholly supersede and nullify the original option. By this contract Dalton was given the right, for the period of ninety days, to purchase Crane's interest, not only in the Cole and Crane lands, but in all lands and interests in lands held by or for the benefit of the parties, at a specific price, and upon definite and specific terms. Counsel for plaintiff contend that when this option was allowed to lapse by limitation, the old option was revived, and remained in full force. We have examined the authorities cited by counsel for defendants in support of their proposition, namely, 3 Williston on Contracts, § 1826; *Rhoades* v. *Ches. & Ohio Ry. Co.*, 49 W. Va. 494; *Runnion* v. *Morrison*, 71 W. Va. 254; *Wade* v. *South Penn Oil Co.*, 45 W. Va. 380; *Myers* v. *Carnahan*, 61 W. Va. 414; *Marsh* v. *Despard*, 56 W. Va. 132; as also the authorities per contra, cited by counsel for plaintiff. But as we view the evidence and the issues in the case, is the point material? We think it is not fairly presented for decision, for there was no election by Dalton and Kelly to take under either option.

Because of the views we have taken of the oral evidence on the subject of the alleged antecedent agreement between the parties as to which of them should pay the purchase price for the Cole and Crane lands, we deem it unnecessary to consider the point of error made against plaintiff's instruction number 3; and we pass to the proposition interposed against instruction number 4. This instruction in effect told the jury that though they might find that the delivery of the deed of November 7, 1923, did not constitute an election by defendants to purchase Crane's interest under the agreement of April 18, 1922, yet if they believed from the evidence that plaintiff's interest was the amount of $5.00 per acre net, to be paid him in the event defendants took over said land, or excluded him therefrom, and that said deed was so executed and delivered to defendants pursuant to an agreement that the execution and delivery thereof should not interfere with nor change the plaintiff's interest in said lands, and further with the understanding and agreement that defendants might use the same, and the property conveyed, in a then contemplated bond issue, and if so used that defendant would pay him out of the proceeds derived from said bonds the sum of $5.00 per acre, and that defendants failed to procure said bond issue, and without any further agreement with plaintiff, and without having paid him the sum aforesaid, defendants to promote their own business affairs in which he had no interest, caused the Main Island Coal Corporation to convey said lands to the W. M. Ritter Lumber Company, without the knowledge, acquiescence, consent or authority of plaintiff, then plaintiff is entitled to recover the sum of $5.00 per acre for the land aforesaid, and the jury should so find.

This proposition, we think, finds no substantial support in the law or the evidence. If there was no election by the defendants to take and pay for the land at the rate of $5.00 per acre, and the bond issue failed, on which the other promise was predicated, the fact that defendants afterwards directed the sale and conveyance of the land to the W. M. Ritter Lumber Company without the consent of plaintiff would not obligate defendants to pay him $5.00 per acre; the proposition

contains a non sequitur. Upon the theory of the instruction the law would at most bind defendant to pay plaintiff damages only for his actual loss on account of the alleged breach of duty. It is urged with force also that this instruction ignores the right of one partner to sell the partnership property to pay debts and obligations of the partnership. That plaintiff regarded the venture as one pertaining to a partnership is declared by the contract entered into by all the parties with one Wittenberg, on January 27, 1923. This contract, as the other dealings between the parties, evidences a profit-making scheme, the employment of Wittenberg to sell the land on commission, and to divide the profits, Wittenberg to have $100,000.00 out of any profits made. In this case Crane had not invested a dollar in the purchase of the partnership property. His sole interest therein was the amount of profits that might arise from the venture, at least until he became bound by the two $250,000.00 notes secured by deed of trust on the property; and the record shows that the firm was facing financial disaster, himself included, when in his absence it became necessary to sell the properties then involved, to the W. M. Ritter Lumber Company. It is well settled that a managing partner may sell the partnership assets, except real estate, to pay debts, and that his acts will bind the firm. *McCullough et al.* v. *Sommerville,* 8 Leigh 415, Anno. 951, and notes; *Williams* v. *Gillespie,* 30 W. Va. 586; *Thompson* v. *Bowman,* 6 Wall. 316; 20 R. C. L. p. 862. In the case at bar, the property had been conveyed by all parties to the coal corporation for the purpose of enabling the managing partners to sell, mortgage or dispose of it in the absence of Crane. It had previously been conveyed by the individual partners to secure a part of the purchase money paid for the property. And finally, when all other plans failed, Dalton and Kelly, through the coal company, caused it with the Barnsdall lands to be sold to the W. M. Ritter Lumber Company; and one of the ways by which plaintiff's counsel seek to sustain the verdict is by a showing that a profit was actually realized on that sale, equal to or greater than the verdict. So we conclude that instruction number 4 was bad, and ought to have been rejected. Whether the

plaintiff is entitled to recover anything on account of supposed profits in the sale of the Cole and Crane lands to the W. M. Ritter Lumber Company, is a question we can not decide in this case; it is not pleaded, and if it were, it is questionable whether a suit founded upon an unsettled partnership account could be maintained at law. We think it would more properly be the subject of equity jurisdiction.

Our conclusion is to reverse the judgment and award the defendants a new trial.

*Reversed; verdict set aside; new trial awarded.*