## CHARLESTON.

### RUNNION v. MORRISON.

Submitted March 7, 1911.    Decided November 12, 1912.

1. BROKERS—*Real Estate Brokers—Right to Commission.*
    In an action by a broker or agent, against the seller, on an agreement to pay him a commission for making sale of land, under a written option to buy it at a fixed price and on stated terms, it is no defense that the agent or broker was also paid a commission by the purchaser, to whom he had assigned his option contract. (p. 256).

2. CONTRACTS—*Modification.*
    A second option contract between the same parties, in respect to the same subject-matter, entered into before the expiration of the first, fixing the same price but changing the terms of payment, abrogates the first option. (p. 257).

3. FRAUDS, STATUTE OF—*Services Rendered to Third Person.*
    The promise by one person to compensate another for services thereafter to be rendered to a third person, is an original promise, and need not be in writing to be binding (p. 259).

4. APPEAL AND ERROR—*Harmless Error—Erroneous Instructions.*
    A judgment will not be reversed for erroneous instructions, if the verdict on which it is rendered is according to law and the facts, either admitted or fully proven and not denied. In such case there is no prejudice. (p. 260).

Error to Circuit Court, Braxton County.

Action by E. E. Runnion against W. F. Morrison. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Linn, Byrne & Hines,* for plaintiff in error.
*Hall Bros.,* for defendant in error.

WILLIAMS, JUDGE:

E. E. Runnion recovered a judgment for $852.33 against W. F. Morrison in the circuit court of Braxton county, and Morrison was granted this writ of error.

Counsel for defendant insist that the verdict is against both the law and the evidence; and the first assignment of error relates to the overruling of defendant's motion to set it aside.   The action was brought to recover fifty cents per acre for making sale of coal underlying certain lands in Braxton county, aggregating 2,074 acres, of which J. H. Chapman owned 190 acres, E. J. Hall 139.7 acres and plaintiff the balance.   On the 3rd of May, 1906, Morrison executed to Runnion a written option agreeing to sell the coal underlying his lands, at the price of $7.50 per acre to be paid for as follows: viz.: $1,000 on or before May 12, 1906; one-third of the whole purchase price as soon as the lands could be surveyed, titles abstracted and proper deeds made; and the balance in two equal instalments, in one and two years. The option was to become void, if the $1,000 was not paid on, or before, the 12th of May.   At the same time Morrison also agreed, by a separate writing, to give Runnion fifty cents an acre for making the sale.   Runnion testifies that, shortly after executing the writing, Morrison also agreed, orally, to pay him fifty cents an acre to sell the Hall and Chapman coal.   Runnion procured purchasers who bought both coal and surface of Morrison's land, at the price of $11 per acre, and also the coal underlying the Chapman and the Hall tracts at $7.50 per acre.   The $1,000 was paid on the 12th of May by check of W. A. Stone, one of the purchasers; and later, the sale of the Morrison land, and the Hall and the Chapman coal was completed, and conveyances were made by the several owners to W. A. Stone, Joseph Kerr and John R. Carruthers.

About ten days before that time, Morrison had given Runnion an option to buy both coal and surface of his land at $11 per acre, on terms of one-half payable in thirty days, and the balance in twelve months with interest.   That option also authorized Runnion to sell the coal alone at $7.50 per acre, on the same terms of payment that were provided in case he sold the fee; but there was no provision for commission under the first option. Morrison contends that because both coal and surface were sold, when the option embraced the coal only, it must have

been sold under the first option, which did not obligate him to pay commissions. But it is clear that the second option, the one of May 3, 1906, was complete within itself and entirely supplanted the one of April 24th. The giving of the second, in place of the first, option, is thus explained by Runnion, and not denied by Morrison, viz: Runnion says he took the first option to Uniontown, Pennsylvania, and presented it to his prospective purchasers, and that they were not satisfied with its terms; that, as soon as he returned from Pennsylvania, he made their dissatisfaction known to Morrison, and thereupon the new option of May 3, 1906, and the separate written agreement to pay him fifty cents per acre were executed. He also testifies that he informed Morrison fully in regard to his relations with the purchasers; that he told him they were to pay him only fifty cents per acre, for buying the coal, and that he could not handle it for less than $1 per acre. Morrison knew that Runnion was not buying for himself; the option was immediately assigned to the real purchasers, and the cash payment of $1,000 was made by check of W. A. Stone, one of them, either payable directly to Morrison, or to Runnion, and indorsed by him to Morrison. In view of all the facts and circumstances surrounding the transaction, the relation of Runnion to Morrison was more that of broker than agent. He was not bound to Morrison to procure the best possible price; Morrison had fixed both price, and terms of payment, in the option. Runnion had no discretion in the matter. Consequently, his relation to Morrison and to the purchasers did not forbid his receiving compensation from both. He is not estopped to claim compensation from Morrison, because he also received compensation from the purchasers. A middle-man, who acts as broker in bringing together buyer and seller, and who does not act as the agent of either in making the contract of purchase, is entitled to compensation from both, on an agreement with each. *Rupp* v. *Sampson,* 16 Gray 398, 77 Am. Dec. 416; *Alexander* v. *The North-Western Christian University,* 57 Ind. 466; *Montrose* v. *Eddy,* 94 Mich. 10, 34 Am. St. Rep. 323; *Herrman* v. *Martineau,* 1 Wis. 151, 60 Am. Dec. 368; *Lukins* v. *The Nordyke & Marmon Co.* 66 Ia. 471; *Bell* v. *McConnell,* 37 O. St. Rep. 396.

But Morrison contends that, because the surface was included,

in the sale, with the coal, whereas the written option was for the coal only, the sale was made under the first option, by which he was not bound to pay commissions.   The first option gave right to buy both coal and surface, at $11 per acre, or the coal only at $7.50.   And Runnion testifies that, after the second option was executed, Morrison told him to sell the surface also, if he could, at $3.50 an acre, and that he agreed to do it.   Morrison denied this, and it presented a question of veracity which the jury, not the court, had to decide.   That Runnion did sell the coal and surface together, is proven and not denied; and that Morrison assented to it is conclusively shown by his executing deed therefor.   But, Morrison says he never agreed to accept less than $11 per acre for both surface and coal, and that if he must pay fifty cents per acre commissions, he will be getting only $10.50 per acre.   But Runnion says he had authority, orally given, shortly after the second option was signed, to sell the surface along with the coal at $3.50 per acre; and Runnion's testimony on this point, and Morrison's denial of it is purely a jury question.   But the first option fixed the value of the fee at $11, and the coal at $7.50, per acre, thus showing that Morrison, at that time, only ten days before, valued the surface at $3.50 per acre.   This fact appears to corroborate Runnion, at least as to value placed by Morrison on the surface.

The second option clearly abrogated the first one; it was a new proposition changing time of acceptance and terms of payment, and was wholly independent of the first.   And the oral agreement to let the surface go along with the coal, at $3.50 per acre, did not affect the option contract for the coal, and constitutes no defense to plaintiff's claim for commissions for the sale of the coal at $7.50 per acre.

Runnion admits that he had no written contract with Morrison, authorizing him to sell the coal in the two tracts of land owned by Hall and Chapman; but he testifies that Morrison told him that he and they had agreed between themselves to sell their coal in a body, and that he (Morrison) had authority to sell their coal when he should sell his own, and at the same price; and that Morrison orally agreed with him to pay him the same price per acre for selling their coal, that he had agreed to pay him for selling his own.   That Runnion did sell their coal to the same purchasers, at the same time, and at

the same price at which he sold the Morrison coal, is proven, and not denied. But Morrison denies that he promised to compensate him for selling it; and his counsel insist that it would be in violation of the statute of frauds, and unjust to compel him to do so. But the justice of the case depends upon their agreement; and the question whether or not there was an agreement, is a fact to be decided by the jury. The testimony concerning it is conflicting, and the jury's verdict is, in effect, a finding that Morrison made the promise. Consequently, even if Runnion's testimony were uncorroborated by any fact or circumstance in the case, the Court would not be warranted in disturbing the verdict; because the question depends upon conflicting oral testimony. Moreover, the following facts appear to corroborate Runnion, because they tend to prove that Morrison was personally interested in having sale made of the Hall and Chapman coal, and, being thus interested, he would likely have made the promise to compensate Runnion, viz.: The purchasers agreed to pay $8 per acre for their coal, and paid fifty cents of it to Runnion, and $6 of it directly to Hall and Chapman, respectively, and $1 to E. G. Rider, as the agent of Morrison. Rider turned the $1 per acre, due Hall, over to Morrison, and he paid it to Hall; as to the $1 per acre paid to him on account of the Chapman coal, Rider says that a settlement is yet to be made between himself and Chapman. True, Morrison says he never received a cent for the sale of the Hall and Chapman coal. But, if he was not to receive anything, why should the $1 per acre have been paid to Rider, as his agent? Why was not the whole purchase price, $8 per acre, less the fifty cents commission to Runnion, paid directly to Hall and Chapman, respectively? No explanation is given for this circuitous method of payment. Moreover, Rider testified that there is fifty cents per acre yet in the hands of the purchasers, due to someone for the Hall and Chapman coal, but he does not say to whom it is due; and Mr. Kerr, one of the purchasers, admits in his deposition that it appears, from the account which he kept of the matter, that fifty cents per acre, for the Chapman tract, was yet due somebody. But it is proven that complete settlement was made between the purchasers and Hall and Chapman, at $6 per acre, which is the equivalent of the consideration recited in their respective deeds. Furthermore, Hall says Morrison told him that he was only getting $7 an acre for his coal,

and that he (Hall) should have the same for his; but Runnion says he told both Morrison and Rider that he was selling the coal at $8 per acre, of which price he was to get fifty cents direct from the purchasers. So that, it would seem, the fifty cents per acre, still unpaid, is not claimed by Runnion; and that, if it is due Hall, he seems not to have been advised of it. If it is coming to Morrison, it will reimburse him the amount which Runnion says be agreed to pay him to sell Hall's land. But whether Morrison was directly benefitted by the sale of the Hall and Chapman coal or not, is not material; the benefit flowing to the third parties, Hall and Chapman, was sufficient consideration to support Morrison's promise to Runnion.

Counsel for Morrison urge that his promise, even if sufficiently proven, was a promise to pay the debt of another; and, not being in writing and signed by him, or his agent, falls within the statute of frauds. But the promise was not to pay another's debt. Hall and Chapman owed Runnion nothing. The services were rendered by Runnion for Morrison, at his special request; the promise was to pay for services thereafter to be rendered. The promise was, therefore, original, and needed not to be in writing. That Hall and Chapman may be benefitted more than Morrison. by the sale of their coal, does not make Morrison's promise secondary.

On October 18, 1906, Runnion executed his note to Morrison for $300, which recited that it was for money loaned. It was filed, and allowed, as a set-off to plaintiff's claim. It is insisted that the execution of the note is a strong circumstance supporting Morrison's testimony that he owed Runnion nothing; his counsel argue that it would be very unlikely that Runnion should borrow money from Morrison at a time when he claimed Morrison owed him more than the amount borrowed. But, as to the character of that transaction and whether or not Runnion knew he was in fact signing a note, there is again conflict between his testimony and that of Morrison. Runnion had a right to give his explanation of the dealing, and it was then the province of the jury to determine between him and Morrison which spoke truly. The form of the note is unusual; no time of payment is named, it is not even made payable on demand, and it bears no interest. Runnion testifies that it was not given for money lent; he says that he could only write his name, and could not read writing

at that time, and did not read the note; that he applied to Morrison for money, with the expectation that it would be a payment on the commissions Morrison owed him, and thought he was signing a receipt for the $300, and did not know that he had, in fact, signed a note.    On the other hand, Morrison testifies that Runnion did know it was not a receipt; he says he read the paper to him, before he signed it.    But, even if the note was given for borrowed money, it would not conclusively disprove the fact that Morrison owed Runnion at the time more than the amount of the note.

The court gave eleven instructions for plaintiff, all of which were objected to by defendant; but counsel, in their brief, seem to have abandoned most of their objections; and we have already, in effect, decided the questions raised by some of them.    The most strenuous objection is made to the first two instructions.    No. 1, in effect, tells the jury that plaintiff is entitled to fifty cents an acre for making sale of Morrison's coal, under the option and contract of May 3, 1906, notwithstanding the sale was made of both the coal and surface, if they believe that defendant later conveyed the entire fee, with the understanding that the coal was being sold at the price named in the option; to which is added the following qualification, viz.: "unless you believe from the evidence that plaintiff acted as agent for both Morrison and Stone, Kerr and Carruthers, without their knowledge, *in such a way as to deprive him of compensation.*"    Objection is made to the italicized words. Counsel insist that the jury were not instructed in regard to what would be sufficient to deprive plaintiff of compensation; and that, therefore, the instruction submitted to the jury a question of law.    But, we observe, the court did, in fact, instruct the jury in four other instructions, viz.:    Nos. 7, 8, 9, and 10, as to the manner in which an agent, or broker, acting for both buyer and seller, might deprive himself of his right to compensation. So that, reading all the instructions together, we do not think there could have been any doubt, or confusion in the minds of the jury concerning the law of the case.    Moreover, while it is generally error to submit pure questions of law to the jury, still such error does not call for reversal, if it is clearly apparent that it has worked no prejudice to the party complaining.    If the facts are

admitted, or are clearly proven, to which the question of law is to be applied, and the jury's verdict accords with the law as well as the facts, there is no prejudice. It is proven by Runnion's testimony, and not denied by anyone, that he told Morrison he was to receive fifty cents per acre from the purchasers; the price which Morrison was to receive and the terms of payment were fixed by the option contract; this denied discretion to Runnion. Consequently, the facts by which Runnion's relation to buyer and seller, and his right to contract with each for separate commissions, being fully proven, the question of his right to recover from Morrison depended wholly on Morrison's written promise which was not denied. The question was, therefore, one of law for the court, and not a fact for the jury. The court could very properly have instructed the jury to find for the plaintiff, so far as it concerned his claim for making sale of Morrison's 1,744.34 acres. That the court did not do so, but improperly submitted the question of law to the jury, furnishes no cause for setting aside the verdict. Because the verdict accords with both law and evidence, and all errors committed in the progress of the trial are thereby rendered harmless.

The same objection is made to instruction No. 2, which relates to plaintiff's right to compensation for the sale of the Hall and Chapman coal; and the reason given to show that the objection to No. 1 is unavailing applies as well to it. The only question that rendered doubtful plaintiff's right to recover compensation for selling the Hall and Chapman coal, was the disputed fact of defendant's promise to pay for having it sold; and that fact depended upon the conflicting oral testimony of two witnesses only, plaintiff and defendant; every other essential fact was fully proven, and was not denied. Hence, the court could very properly have told the jury that they should find for the plaintiff, as to the compensation claimed for the sale of the Hall and Chapman coal, if they believed that defendant made the oral promise testified to by plaintiff.

The court did not err in refusing defendant's instructions "E" and "G." Instruction "E" would have presented a question of law, not of fact. The first option was never accepted, never acted on; it was only an unaccepted proposition, and never became a contract. The second option was given before the expiration of

the time of acceptance fixed by the·first, and, therefore, supplanted it.

Instruction "G" was properly refused, because there is no evidence on which to base it; there is no evidence that Runnion induced Morrison to include the surface, to enable Runnion to make sale of the coal.

The judgment will be affirmed.

*Affirmed.*