MYRTLE J. MOORE

*v.*

EDGAR D. TURNER

(No. 10405)

Submitted January 22, 1952. Decided June 17, 1952.

Lovins, Judge, concurring.

*Ezra E. Hamstead,* for plaintiff in error.

*Robert T. Donley,* for defendant in error.

Haymond, Judge:

This action of assumpsit was instituted on August 7, 1950, in the Circuit Court of Monongalia County, West Virginia, by the plaintiff, Myrtle J. Moore, to recover from the defendant, Edgar D. Turner, compensation which the plaintiff claims he owes her, under a verbal contract entered into between them, for services rendered by her in connection with the sale in April, 1950, by the defendant and

his associate owners, to the Pittsburgh Consolidation Coal Company, of a large tract of Pittsburgh coal and certain mining rights, containing 1,112.26245 acres, known as the Turner Tract of Pittsburgh coal situated in Cass District in that county. To the declaration, which contains two common counts and a special count, the defendant filed his plea of the general issue. Upon the trial the jury, on December 14, 1950, returned a verdict in favor of the plaintiff for $33,367.85, being ten per cent of the purchase price of $333,678.74, which on motion of the defendant the circuit court set aside by order entered February 16, 1951. To the order setting aside the verdict and granting the defendant a new trial this Court awarded this writ of error upon the petition of the plaintiff.

The plaintiff, a married woman, residing in Monongalia County, has been a licensed real estate broker since the year 1948, and for several years previously had been well acquainted with coal lands in that county, including numerous parcels of Pittsburgh coal which were variously included in three large adjacent tracts known as the Turner Tract, the Brand Tracts, and the Hatfield Tract. These large tracts together contained approximately 4,500 or 5,000 acres, and were, at a time several years before the inception of this controversy, considered by the various owners as comprising a unit or an entire block of coal. There were two separate parcels comprising the Brand Tracts, one of which, containing 175.4339 acres, was owned principally by Charles H. Brand, the father of the plaintiff, and the other of which, the acreage not being shown, was owned by the heirs of Elmer G. Brand. The plaintiff owned a small interest in a portion of the surface of, or the Pittsburgh coal in, the tract principally owned by her father, and her ownership of this interest rendered it necessary for her and her husband to join in a deed, dated February 8, 1950, and acknowledged by them on March 8, 1950, which conveyed that coal to the Pittsburgh Consolidation Coal Company.

The defendant, a resident of Washington, D. C., and also a licensed real estate dealer, had engaged in that busi-

ness in that city for many years and was well acquainted with coal lands in Monongalia County.

For some years prior to the occurrence of the transactions which resulted in this litigation, the plaintiff made a number of unsuccessful attempts to negotiate a sale of these different tracts. During that period of time and perhaps in 1944 or in 1946, the evidence as to the time not being clear, and again in 1949, there was an arrangement or an agreement among the plaintiff, who was interested in a sale of the Brand Tracts, the defendant, as the representative of the Turner Tract, and John L. Hatfield, as the representative of the Hatfield Tract, which, in substance, was that these tracts should be sold as a unit and at the same price per acre and not separately except by mutual consent. It appears that for some time prior to March 18, 1950, the plaintiff considered this arrangement terminated but that the defendant regarded it, at least in some respects, as being still in force when the contract between him and the purchaser of the coal owned by him and his associates became effective on April 18, 1950.

As already indicated the plaintiff, for some time prior to March 18, 1950, had made repeated efforts to induce the Pittsburgh Consolidation Coal Company, which owned a large acreage of Pittsburgh coal near or adjacent to the Turner Tract and the Brand Tracts, to purchase the Turner Tract. These negotiations, however, had failed of consummation because of the inability of the plaintiff, in behalf of the defendant, and the company to agree upon the price per acre for the coal in the Turner Tract. The highest price that the company had previously indicated a willingness to pay was $250.00 per acre for the Pittsburgh coal in the Turner Tract and the defendant had declined to sell it at that figure.

On March 18, 1950, however, the plaintiff, being at Pursglove, Monongalia County, where an office of the Pittsburgh Consolidation Coal Company was located, and still being desirous of negotiating a sale of the coal, in a further effort to do so, called at the office of the company and discussed the matter with one of its vice presidents. In the conversation which occurred at that time, he men-

tioned the price of the coal as $250.00 per acre, but told the plaintiff that if the defendant would agree in writing to accept $300.00 per acre for the coal, he would present such offer to the company at a meeting of its board of directors to be held in April of that year. He emphasized, however, that the price then was $250.00 per acre, and made it clear that he could not assure the plaintiff that the company would pay a price of $300.00 per acre. At that stage in their conversation the plaintiff, with knowledge and consent of the vice president, from his office, called the defendant by telephone at Washington. According to her testimony she asked the defendant, whose voice she recognized, if he still wanted her to try to sell the coal and if he would pay her a commission of ten per cent if she should find a buyer of the coal at a price of $300.00 per acre and, after he answered those questions in the affirmative, she told him that the prospective buyer was the Pittsburgh Consolidation Coal Company and that it would be necessary for the defendant to submit his offer in written form to be presented to the board of directors about the first of April.

The plaintiff further testified that the defendant said that he wanted that information from some official of the company and that she replied that she would have the vice president confirm her statement by telephone; that at her request the vice president, using an extension telephone, then joined in the telephone conversation which to that point had occurred between the plaintiff and the defendant; that she heard the vice president tell the defendant that he had no authority to pay $300.00 per acre; that the price was $250.00 per acre but that he had told the plaintiff that if she could get a written statement from the defendant that he would agree to accept $300.00 an acre for the coal he would present it to the board of directors; that the defendant told the vice president that he would submit such a statement; that the defendant asked the vice president if the transaction included the Brand coal; that the vice president replied that it did not include that coal; that the vice president told the defendant that he had heard him and the plaintiff discuss a commission

of ten per cent, that the defendant should understand that the company would not pay the plaintiff any commission, and that the defendant would have to pay his own brokerage fee; that the defendant stated that he would be glad to pay the plaintiff ten per cent commission if the offer was accepted; that the plaintiff then asked and urged the defendant to make his written offer immediately; and that he replied that he would do so as quickly as he could.

The testimony of the vice president, who was produced as a witness for the plaintiff, corroborated the statements of the plaintiff which he had heard in the telephone conversation between the plaintiff and the defendant. In his testimony the defendant did not deny the foregoing testimony of the plaintiff except that part of it which related to the payment of commission. As to that phase of the telephone conversation he testified that he did not recall that anything was said at that time about any commission; that it had been distinctly understood between him and the plaintiff that she should get one third of a commission of ten per cent; and that he had never told her that he would be glad to pay her a commission of ten per cent.

After the foregoing telephone conversation on March 18, 1950, the defendant submitted a written offer to sell the coal in the Turner Tract, consisting of 1,112.26245 acres, to the Pittsburgh Consolidation Coal Company at the price of $300.00 per acre. This written offer, dated April 12, 1950, addressed to the Pittsburgh Consolidation Coal Company, and signed by the defendant, was accepted by the company on April 18, 1950. The defendant did not attempt to avoid or rescind the contract and subsequently he and his associates, as the owners of the Turner Tract of 1,112.-26245 acres, conveyed that acreage of Pittsburgh coal, by proper deeds, to the Pittsburgh Consolidation Coal Company at the price of $300.00 per acre and received for the coal and the mining rights the sum of $333,678.74. A commission of ten per cent was deducted by the defendant from most of the shares of the purchase price to which his associates were entitled, and the portion of the commission so deducted is now retained by the defendant, who has

refused to pay it and his portion of the commission claimed by the plaintiff to her. Though the exact dates that the deeds from the defendant and his associates to the purchaser were made and recorded are not disclosed by the record, it appears that these deeds were recorded prior to July 14, 1950, at which time a deed dated February 8, 1950, for the Charles H. Brand Tract of Pittsburgh coal containing 175.4339 acres, signed and acknowledged by Charles H. Brand, Dora B. Brand, Myrtle J. Moore and Charles O. Moore on March 8, 1950, was admitted to record in the office of the clerk of the county court of Monongalia County.

For some time before the purchaser, the Pittsburgh Consolidation Coal Company, accepted the offer of the defendant to sell the Pittsburgh coal in the Turner Tract, the plaintiff, according to her testimony, unsuccessfully endeavored to sell the coal at the respective prices of $500.00 per acre, $400.00 per acre, and $350.00 per acre; and the price of $300.00 per acre, at which the coal was eventually sold, was the highest price which she was able to obtain for the coal. After the telephone conversation between the plaintiff and the defendant on March 18, 1950, the plaintiff talked to the vice president of the purchaser several times and urged him to assist in obtaining an acceptance of the defendant's offer to sell the coal. When the plaintiff learned that the offer had been accepted she communicated with the defendant by telephone and, according to her testimony, he complimented her for her successful effort and expressed his satisfaction with the manner in which the sale had been effected. The plaintiff also testified that after the defendant had received written notification from the purchaser that it had accepted his offer she engaged in a telephone conversation with him in which she told him that her work was finished and that her commission was due and owing to her; that he then told her that he had incurred much expense and owed some attorneys in Morgantown; that he needed one third of her commission to pay them and wanted another one third for himself; that she told him definitely that she would not divide her commission with him or anybody

else because she had done all the work that she was required to do and that her work was completed; and that he did not then assert that she had not fully earned a commission of ten per cent on the entire purchase price. In his testimony the defendant denied that he had made the respective statements which the plaintiff testified he had made in those conversations.

Shortly after the second of the foregoing conversations testified to by the plaintiff, she wrote the defendant a letter dated April 21, 1950, which contained this statement: "I was in the coal company office with Mr. Nailler when I quoted you the price of three hundred dollars per acre less a ten per cent discount and this was confirmed over the phone as we both talked to you, and the understanding was clear and mutual." In the same letter, referring to the attorneys, the plaintiff wrote: "It is perfectly satisfactory with me if you wish to give them something personally, but I want you to understand that I do not intend to have any dealings with them. From my point of view they are not entitled to anything and certainly will not get anything from me."

By letter dated April 29, 1950, the defendant made this reply:

"In response to your recent letters and telephone calls regarding commission which you claimed on the sale to Pittsburgh Consolidation Coal Company of the Pittsburgh seam of coal in Cass District, Monongalia County, West Virginia, owned by myself and others, I have to report as follows:

"When you stated to me over the telephone that the Brand coal was being sold at $300.00 per acre, that information was passed on to the various people associated with me in the ownership of the coal and had a large bearing on their reluctant consent to sell at that price. Now I am informed that the Brand coal was contracted for at $400.00 per acre. If this information is correct, it would seem that you were not acting in behalf of myself and associates and

accordingly that you would not be entitled to any commission whatever."

Sometime after the plaintiff received the foregoing letter from the defendant she unexpectedly met him in the courthouse at Morgantown and, according to her testimony, she said to him: "Now, Mr. Turner, you know I did what I agreed to do, and now my commissions are due and owing to me, and when do you intend to pay them?"; and that he replied: "I don't intend to pay you."

The two parcels of Pittsburgh coal referred to in the evidence as the Brand coal or the Brand Tracts were sold and conveyed by their owners to the Pittsburgh Consolidation Coal Company by deeds dated February 8, 1950, and acknowledged by the grantors on March 8, 1950, in one of which deeds the plaintiff joined. These tracts did not adjoin each other but each of them is adjacent to the Turner Tract. One of them, known as the Charles H. Brand tract, adjoined the Turner Tract on the west and the other, known as the Elmer G. Brand tract, adjoined the Turner Tract on the east, and both of them lie between the Turner Tract and other Pittsburgh coal owned by the Pittsburgh Consolidation Coal Company. Prior to the sale of the Brand Tracts the plaintiff had made numerous attempts to negotiate a sale of the Charles H. Brand tract to the Pittsburgh Consolidation Coal Company but she and its representative had been unable to agree upon a price for that coal. Sometime in the month of January, 1950, she accompanied her father, Charles H. Brand, to the office of the company at Pursglove in Monongalia County and discussed the matter of a sale of the Pittsburgh coal in that tract with a representative of the company. According to the testimony of the plaintiff, however, no sale having been negotiated at that time, she ceased to act for her father and he negotiated the sale that eventually resulted.

The plaintiff also testified that she did not negotiate the sale of the Elmer G. Brand tract. Other witnesses, connected with the company, who knew of the sale of the Brand Tracts, testified that the plaintiff was present when

the contract for the sale of the Charles H. Brand tract to the company at the price of $400.00 per acre was made, and the evidence shows beyond question that she knew of the sale of the Brand Tracts to the company at that price at the time she talked to the defendant by telephone on March 18, 1950, and that she did not tell the defendant of the sale of those tracts at that time or before his offer to sell the Turner Tract was accepted by the purchaser. When first asked if she knew of the sale of the Brand Tracts at the time she talked to the defendant by telephone on March 18, 1950, she stated that she did not know when that coal was sold; and on cross-examination she stated that she did not know on March 8, 1950, that the Elmer G. Brand tract had been sold and the purchase money paid.

The deed for the Charles H. Brand tract of coal dated February 8, 1950, a photostatic copy of which was introduced in evidence, which deed the plaintiff admitted she signed as a grantor and was acknowledged by her on March 8, 1950, before a notary; the testimony of the vice president of the Pittsburgh Consolidation Coal Company, who was produced as a witness by the plaintiff, that the plaintiff was present with her father and the witness when the negotiations for the sale of the Charles H. Brand tract were completed sometime in January, 1950, that she was familiar with all the terms of the transaction, that she knew that both the Brand Tracts of coal were being sold to the purchaser at the price of $400.00 an acre and that on March 8 or 9 when deeds for the Brand Tracts were delivered and the purchase money paid the plaintiff was present and received a check or checks for her father's interest in the coal for delivery to him; the testimony of a witness produced by the defendant that the plaintiff was present in his office when the deeds for the Brand Tracts were delivered; and the admission by the plaintiff that she was given one of the checks by the vice president of the purchaser and that she gave that check to her father and her mother, established beyond question that when the plaintiff talked to the defendant by telephone on March 18, 1950, she knew that the Brand Tracts had

been sold and conveyed by their owners to the Pittsburgh Consolidation Coal Company at a price of $400.00 per acre. The plaintiff admits that she did not inform the defendant of the sale of the Brand coal or the price for which it was sold before the offer of the defendant to sell the Turner Tract at $300.00 per acre had been accepted by the purchaser in April, 1950; and in explaining the reason for her failure to disclose these facts to the defendant she testified that the defendant had not asked her for that information and that if he had done so she would have given it to him.

The plaintiff also wrote the defendant a letter dated March 9, 1950, which contained, among others, these statements:

"We are definitely with you, providing you care to go along in selling your acreage, but we are not going to delay matters for anyone else. The only time to sell is when you have a buyer and the only buyer you can ever have is Consolidation Coal Company. * * *.

"The price is three hundred dollars ($300.00) cash per acre, less a 10% commission. I am including you in this commission and will come to Washington to discuss this matter with you personally. We are definitely planning to sell our coal and do not want you to be left stranded, as it has been a terrible hardship on all of us, and this is a sure sale, and no 'wild goose chases' like you have been making for the past years and nothing happening, as the most of these trips you have made back here were uncalled for as there was no deal in sight, just to keep us all tied together for the benefit of someone else who was depending on our coal selling his, * * *.

"This has been no easy task getting this Company interested because they have mined up to our coal, took up the tracks and quit mining, and intended to let us set there for the next twenty years, since they do not need our acreage for this length of time. * * *.

"I am hoping that you will give this immediate consideration and reply to me by return mail."

The plaintiff attemped to explain the date of this letter, with reference to the date of March 8 when the deeds for the Brand Tracts were delivered, by the statements that she had written the letter before the sale of the Brand Tracts had been concluded and that "it had to be before the Brand deal was closed." The plaintiff denied that she acted as a broker in connection with the sale of the Brand Tracts but stated that she was the broker for the defendant in the sale of the coal owned by him and his associates.

The defendant, in his testimony, denied that he had ever told the plaintiff that he would pay her a commission of ten per cent on the sale of the coal at a price of $300.00 per acre, and stated that he had no recollection that he commended her for negotiating the sale at that price, or that she told him on April 21, 1950, that her commission was due, or that he said that he wanted one third of the commission to pay his attorneys and one third of it for himself. He testified that he learned on March 25, 1950, that the Brand coal had been sold but that he did not know the price; that he thought the price was $300.00 per acre; and that he did not know that it had been sold for $400.00 per acre until October 30, 1950. He also testified that sometime after he received the letter dated March 9, 1950, from the plaintiff, and before he submitted his offer to sell the coal for $300.00 per acre, she told him in a telephone conversation that the Brand Tracts had been sold at a price of $300.00, that he believed this statement, and that if he had known that the Brand Tracts had been sold for $400.00 per acre he would not have sold the Turner Tract at a price of $300.00 per acre. The defendant further testified that after the telephone conversation with the plaintiff on March 18, 1950, he made the contract of sale with the purchaser on his own terms and conditions and that he did not after that time consult the plaintiff in connection with its terms and provisions.

The deeds for the Brand Tracts to the Pittsburgh Consolidation Coal Company were not recorded until July 14, 1950, which date was subsequent to the date the contract of sale was entered into between the defendant and that

company, and its vice president testified that the delay in recording those deeds was permitted for the purpose of enabling the defendant to obtain options from some of his associates to sell the coal in the Turner Tract at the price of $300.00 per acre.

Upon the trial the plaintiff offered to prove that the value per acre of the coal in the Brand Tracts was greater than that of the coal in the Turner Tract, but, upon objection, the circuit court refused to permit the introduction of evidence on that question.

The plaintiff tried the case and sought a recovery in the circuit court on the theory that under the contract of March 18, 1950, between the plaintiff and the defendant, the plaintiff was a middleman, not a broker, and that when the plaintiff obtained a buyer for the coal who entered into a valid agreement with the defendant to purchase it at a designated price, she was entitled to the commission provided by her contract with the defendant. Of the twelve instructions offered by the plaintiff, the circuit court refused seven, 1, 2, 5a, 7, 7a, 8 and 9, and gave five, 3, 4, 5, 5b and 6. Three of the instructions given, 3, 4 and 6, were binding instructions which presented the theory of the plaintiff, and the other two, 5 and 5b, related to the defense interposed by the defendant.

The defendant based his defense on the theory that the plaintiff was a broker and that by misrepresenting and failing to disclose to the defendant material facts within her personal knowledge relating to the sale of the Brand Tracts she has lost her right to any commission for negotiating the sale of the coal of the defendant and his associates. Seven instructions, designated I, III, IV, V, VI, VII and VIII were offered by the defendant, all of which, except instruction VIII, which dealt with the weight of the evidence and the credibility of the witnesses and which was given without objection, were refused. Instruction I would have directed the jury to render a verdict for the defendant, and instructions VI and VII would have presented the theory of the defense interposed by the defendant.

The plaintiff assigns as error the action of the circuit court in setting aside the verdict and granting the defendant a new trial and to sustain her assignment of error asserts: (1) The plaintiff at the request of the defendant produced a purchaser for his coal; (2) the contract of sale was negotiated by the plaintiff; (3) the price, the terms and the conditions were determined by the defendant; (4) the sale was made, under the contract negotiated by the plaintiff, according to the terms and the conditions of the defendant; and (5) the defendant has received from his associates, without objection by them, a portion of the commission which he had agreed to pay the plaintiff for her services.

The position of the plaintiff, that in negotiating the contract between the defendant and the purchaser, the Pittsburgh Consolidation Coal Company, for the sale of the Turner Tract, she was not a broker, but a mere middleman, is not supported by the evidence.

The term "broker" has been variously defined by text writers and courts. "A broker is one who is engaged for others, on a commission, in negotiating contracts relative to property with the custody of which he has no concern; * * *." 12 C. J. S., Brokers, Section 1. "Every person whose business it is to negotiate purchases and sales of property with the custody of which he has no concern, neither with the original possession nor the delivery, is a broker." *Lawrence Gas Company* v. *Hawkeye Oil Company*, 182 Iowa 179, 165 N. W. 445, 8 A. L. R. 192. "A broker is a fiduciary required to exercise fidelity and good faith toward his principal in all matters within the scope of his employment." 8 Am. Jur., Brokers, Section 86. Some additional definitions of a broker are: "A person employed to sell property for another * * *." *Abraham* v. *Wasaff*, 111 Okla. 165, 239 P. 138; a person "whose business it is to bring buyer and seller together." *Keys* v. *Johnson*, 68 Pa. 42; and "* * * a middleman, whose business it is to bring seller and buyer together." *Ryan* v. *Walker*, 35 Cal. App. 116, 169 P. 417.

It is said, however, that strictly speaking there is a well

defined distinction between a middleman and a broker, and in discussing that point the text in 12 C. J. S., Brokers, Section 2, uses this language: "A middleman is not subject to the rules governing brokers, but is employed merely to bring together parties, who desire to exchange, or buy or sell, property; and in such transaction his services are not rendered as the agent of either party, but he merely puts the parties in a position where they may make their own contracts, and he may later receive a commission from both." In *Clopton* v. *Meeves,* 24 Idaho 293, 133 P. 907, the court said: "A distinction has been drawn by the courts between what is commonly known as a real estate broker or agent, who undertakes to find a purchaser for a piece of property and to represent the owner in negotiating a sale, and that other personage known as a middleman, who is not supposed to take any interest in negotiating the deal on the part of either party." A differentiating factor between a broker and a middleman is that a broker is employed as the agent of one of the parties and a middleman is employed merely to bring the parties together but does not act as the agent of either party. A person who acts as a middleman merely but who does not act as agent for either party in the negotiation of a sale, may receive a commission from both parties by an agreement with each of them. *Runnion* v. *Morrison,* 71 W. Va. 254, 76 S. E. 457; *Peters* v. *Riley,* 73 W. Va. 785, 81 S. E. 530; *McDermott* v. *Fairmont Gas and Light Company,* 88 W. Va. 692, 108 S. E. 264.

The testimony of the plaintiff is that in her conversation by telephone with the defendant on March 18, 1950, she asked him if he still wanted her to try to sell the coal; that he replied that he did; that she then asked him if he would pay her a commission of ten per cent if she should find a buyer who would agree to purchase the coal for $300.00 per acre; and that he told her that he would. She then told him he would "have to present" an offer to sell in written form for submission to the board of directors of the proposed purchaser "around the first of April." Previously the plaintiff had made numerous unsuccessful efforts to negotiate a sale of the coal at prices ranging

from $500.00 to $350.00 per acre. After the defendant told the plaintiff he would submit the offer, according to the testimony of the plaintiff, she requested the vice president of the purchaser to lend his aid to get the company to accept the offer and urged the defendant to present it promptly. It clearly appears that the plaintiff was actively interested in the consummation of the transaction and that she was employed by the defendant as his representative in its negotiation. Despite the testimony of the defendant that he determined the price, the terms and the conditions, he actually accepted the price which the plaintiff was instrumental in obtaining for the coal.

In discussing the rule which deprives a broker, who secretly represents interests adverse to those of his employer, of his right to compensation, this Court in *Shaver* v. *Consolidation Coal Company*, 108 W. Va. 365, 151 S. E. 326, used this language: "The authorities are practically unanimous in holding that there is one notable exception to the rule, 'and that is to the effect that a broker employed as a mere middleman, or in other words, one engaged not to negotiate a sale or purchase, but simply to bring two parties together and permit them to make their own bargain, may recover an agreed compensation from either or both, though neither may know that compensation is expected from the other. A broker is simply a middleman, within the meaning of this exception, when he has no duty to perform but to bring the parties together, *leaving them to negotiate and come to an agreement themselves without any aid from him*. If he *takes*, or contracts to take, any part in the negotiations, however, he cannot be regarded as a mere middleman, no matter how slight a part it may be.' 4 R. C. L., page 330." It is obvious that the plaintiff, having been employed and having acted as the agent of the defendant, was a broker who participated in negotiating the sale and was not a mere middleman.

The general rule, invoked and relied upon by the plaintiff and firmly established in this jurisdiction, is that a broker who has done all that is required of him by the contract between him and his principal, in the absence

of express provisions to the contrary, is entitled to the compensation provided for in the contract. *Hugill v. Weekley,* 64 W. Va. 210, 61 S. E. 360, 15 L. R. A. (N. S.) 1262; *Linton v. Johnson,* 81 W. Va. 569, 94 S. E. 945; *Wallace v. Prichard,* 92 W. Va. 352, 115 S. E. 415; *Averill v. Hart,* 101 W. Va. 411, 132 S. E. 870; *Kimmell v. Mohler,* 102 W. Va. 355, 135 S. E. 175; *Dowler v. Suburban Improvement Company,* 110 W. Va. 113, 157 S. E. 91; *Clark v. Matheny,* 119 W. Va. 264, 193 S. E. 800.

The foregoing rule, however, does not apply to the material facts, disclosed by the evidence, which bear upon the question of the good faith of the plaintiff in representing the defendant in the negotiation of the sale of the coal of the defendant and his associates. There is much undisputed evidence that at the time the plaintiff and the defendant, in the conversation between them by telephone, on March 18, 1950, entered into the contract upon which the plaintiff relies, she knew that the Brand Tracts had been sold and conveyed, at a price of $400.00 per acre, to the purchaser which she was then attempting to interest in the purchase of the Turner Tract, and that she knowingly misrepresented to the defendant, before he submitted his offer to sell, that the price at which the Brand Tracts would be sold was $300.00 an acre. The evidence shows beyond question that the plaintiff did not, at any time, disclose to the defendant the actual price at which the Brand Tracts were sold. She admits this and gives as her excuse for not doing so the failure of the defendant to ask her for that information. The positive testimony of the defendant is that he relied on the representation of the plaintiff that the selling price of the Brand Tracts was $300.00 per acre and that he would not have sold the Turner Tract at the price of $300.00 per acre if he had known that the Brand Tracts had been sold to the same purchaser at the price of $400.00 per acre.

The well established and widely recognized general rule is that a broker must act with the utmost good faith towards his principal and that he is under a legal obligation to disclose to his principal all facts within his knowl-

edge which are or may be material to the transaction in which he is employed, or which might influence the action of his principal in relation to such transaction. *Sutherland v. Guthrie,* 86 W. Va. 208, 103 S. E. 298; *Mitchell v. Hughes,* 143 Va. 393, 130 S. E. 225; *Harmon v. Moss,* 121 Va. 399, 93 S. E. 609; 4 R. C. L. 272, Section 22; 3 Michie's Jurisprudence, Brokers, Section 13; 12 C. J. S., Brokers, Section 41. In referring to this rule the text in 8 Am. Jur., Brokers, Section 89, is in this language: "The rule requiring a broker to act with the utmost good faith towards his principal places him under a legal obligation to make a full, fair, and prompt disclosure. to his employer of all facts within his knowledge which are or may be material to the matter in connection with which he is employed, which might affect his principal's rights and interests or influence his action in relation to the subject matter of the employment, or which in any way pertain to the discharge of the agency which the broker has undertaken." The faithful discharge by a broker of his duty to act with the utmost good faith towards his principal is a condition precedent to any recovery upon his part for his services, and he is not entitled to compensation if he fails to disclose to his principal any personal knowledge which he possesses of facts which are or may be material to the matter in which he is employed, or which might influence the action of his principal in relation to such matter. 3 Michie's Jurisprudence, Brokers, Section 34; 8 Am. Jur., Brokers, Section 142; *Mitchell v. Hughes,* 143 Va. 393, 130 S. E. 225.

In *Sutherland v. Guthrie,* 86 W. Va. 208, 103 S. E. 298, in which an agent, employed to sell real estate of his principal, sold it for an amount in excess of that at which he was authorized to sell it and attempted to secure the payment of the excess to himself instead of to his principal, was denied any recovery of commission as compensation for his services, this Court, in the opinion, quoted with approval this statement from Mechem on Agency, Second Edition, Section 1588: "As has been already seen, it is often said that the first duty of the agent is to be loyal to his trust, and a number of rules have been already

stated whose purpose is to insure the performance of that duty. Certain of these rules have been designed, not merely to give a remedy for actual wrongdoing, but to remove as far as possible all temptation to wrongdoing. This duty of loyalty, as has been seen, imposes upon the agent the obligation to protect the interests of his principal, to see to it that his own interests or the interests of any one else whom he represents, shall not conflict with his principal's interest, to make no profit for himself at his principal's expense, to render true and honest accounts, to disclose all information coming to him and seeming to be necessary for his principal's protection, and, generally, to render to his principal a disinterested and loyal service. Among the other measures designed to secure the performance of this duty is the denial of compensation where the duty has not been observed; it is often said that a loyal performance is a condition precedent to the right to recover compensation, and it has been held in many cases that, where the agent is unfaithful to his trust and abuses the confidence reposed in him, he will not be entitled to any compensation for his services." See also *Roche* v. *Smith,* 176 Mass. 595, 58 N. E. 152, 51 L. R. A. 510, 79 Am. St. Rep. 345; Annotations, 45 L. R. A. 34, 36, 37, 39; 3 Michie's Jurisprudence, Brokers, Section 34.

Instructions 3, 4 and 5b, given at the instance of the plaintiff, were binding instructions which did not adequately present the theory of the defense. A binding instruction, given in behalf of a plaintiff, which ignores a material defense supported by substantial evidence, is erroneous. *Curry* v. *New Castle Auto Express,* 112 W. Va. 268, 164 S. E. 147; *Stafford* v. *Chesapeake and Ohio Railway Company,* 111 W. Va. 249, 161 S. E. 447; *McWhorter* v. *City of Clarksburg,* 111 W. Va. 9, 161 S. E. 577; *Shaver* v. *Consolidation Coal Company,* 108 W. Va. 365, 151 S. E. 326; *Shires* v. *Boggess,* 72 W. Va. 109, 77 S. E. 542. Instruction 5, given in behalf of the plaintiff, which required the defendant to establish his defense by a "clear and convincing" preponderance of the evidence, did not correctly state the law on that point. An instruction which incor-

rectly states the law is erroneous. *Thomason* v. *Mosrie,* 134 W. Va. 634, 60 S. E. 2d 699. Instruction 6, also given at the request of the plaintiff, was not based upon the evidence. An instruction which is not based upon the evidence is erroneous. *Chesapeake and Ohio Railway Company* v. *Johnson,* 134 W. Va. 619, 60 S. E. 2d 203.

Instructions VI and VII, offered by the defendant but refused by the circuit court, correctly stated a material defense interposed by the defendant and were amply supported by the evidence. Instructions III, IV and V, also offered by the defendant but refused by the circuit court, were not supported by the evidence.

Instruction I, which would have directed the jury to return a verdict for the defendant but which the circuit court refused to give, should have been given. The evidence, as disclosed by the present record, in support of the defense interposed by the defendant that the plaintiff failed to disclose material facts within her knowledge in connection with the sale of the coal in the Brand Tracts and the price for which it was sold which may have influenced the action of the defendant in selling the Turner Tract at a lesser price, in so far as it relates to material and controlling facts bearing upon that subject, is practically undisputed and is without substantial conflict. As that defense was established by clear and undisputed evidence and constitutes a complete bar to the claim of the plaintiff to compensation for her services in connection with the sale of the coal in the Turner Tract, the circuit court should have given the peremptory instruction requested by the defendant and directed a verdict for the defendant.

The case of *Peters* v. *Riley,* 73 W. Va. 785, 81 S. E. 530, cited and relied on by the plaintiff, is clearly distinguishable from the case at bar. In that case the plaintiff, Peters, acted as a mere middleman and not as the agent of the defendant Riley, the landowner, in the negotiation of the sale of the property. The defense against the claim of the plaintiff in the *Peters* case of double agency and bad faith upon the part of the plaintiff was based mainly on a letter by plaintiff to the purchaser, Patterson, in which the

plaintiff stated: "Riley thinks he has eight hundred acres and is figuring on so much money I will not let him know how much he has as it will be better until after you make the deal if you do so." In rejecting the contention of the defendant that the expression in the letter established the bad faith of the plaintiff this Court in the opinion said: "It would not sustain the finding of bad faith, or the suppression of information, on the part of the plaintiff, because it does not prove any information was actually withheld or any fraud or deception practiced. It was a mere statement to Patterson of intention on the part of the plaintiff to withhold such information from the defendant, and it does not appear that he did withhold it or that it was not information already possessed by the defendant. The latter does not say he was in any way mislead by any act or conduct of the plaintiff. Not knowing the quantity of the land, he sold it by the acre and testifies to no expectation on his part of any more purchase money in the aggregate than he actually received." The opinion in the *Peters* case also contains this statement: "The evidence does not establish or tend to prove any agency other than that of mere brokerage. The plaintiff was not authorized by the defendant to make a contract of sale for him. All the essential elements of the contract remained in the sole and exclusive control of the defendant. The plaintiff was a mere intermediary, having no power or authority to do more than find a purchaser and bring the parties together to formulate their own contract and fix its terms and conditions. In such a case, the acceptance of compensation from both parties is unobjectionable. *Runnion* v. *Morrison,* 71 W. Va. 254. The defendant admits the plaintiff came to him as the representative of prospective buyers, the purchaser knew he professed to represent the vendor and neither of them entrusted to him the determination of the price or terms of the sale. It can hardly be said, therefore, that he was even a broker in the strict sense of the term. He was really only a sort of middleman between the contracting parties. Hence, the principle declared in *Truslow* v. *Parkersburg Bridge and Terminal Co.,* 61 W. Va. 628,

and *Guthrie* v. *Chair Company,* 71 W. Va. 383, is not applicable."

Because of the refusal of the circuit court, upon the evidence disclosed by the present record, to give the peremptory instruction requested by the defendant, the action of that court in setting aside the verdict was fully justified. The order which set aside the verdict and awarded the defendant a new trial was correct and that order is affirmed.

*Affirmed.*

LOVINS, JUDGE, concurring:

I concur in the result. I think the trial court erred in rejecting evidence of the respective values of the Turner and Brand Lands. As stated in the court's opinion, the plaintiff offered to show that the coal in the Brand Tracts was of greater value per acre than the coal in the Turner lands. The evidence, upon objection of defendant, was rejected.

If the coal in the Brand Tracts was actually worth $400.00 per acre and the actual value of the coal in the Turner Tract was $300.00 per acre, that fact rendered the sale of the Brand lands immaterial to the defendant Turner. The plaintiff therefore did not withhold information concerning a material matter which affected the defendant's decision to sell his lands. For that reason, I think a comparison of the values of the Brand and Turner lands would have a direct bearing upon the good faith of the plaintiff as well as that of the defendant.

Of course, if the Turner and Brand tracts were of approximately the same value and the Brand tracts were sold for a higher price per acre than the Turner lands, the information as to the respective prices per acre was material and should have been disclosed by the plaintiff to the defendant.

In my opinion the rejection of the above mentioned evidence constitutes another ground for setting aside the verdict of the jury.